## THE STATE v. E. P. BANCROFT.

1. THE STATE *Not a Corporation.* The state is not an incorporation or corporation within the meaning of those terms as used in section 1 of chapter 83 of the laws of 1873.

2. SEC. 1, CH. 83, LAWS OF 1873, *Construed.* The expression "any agent," in the latter half of said section, is comprehensive, and the scope of that half of the section is broad enough to include the agent of any party, whether private person, partnership, corporation or the state, who is guilty of the misconduct therein named.

3. INTENT GOVERNS, *When Ascertained.* The cardinal canon of construction, to which all mere rules of interpretation are subordinate, is that the intent, when ascertained, governs.

4. AGENCY, *Not Revoked.* The defendant was in 1872 appointed by the board of directors of the state normal school agent for the sale of lands. *Held,* That such agency was not revoked by chapter 135 of the laws of 1873, which placed the control of said school in a board of regents.

5. DEMAND *in Embezzlement; Form of.* To sustain a conviction under the last half of said section 1 of chapter 83, there must be proof of a demand. Such demand must also be made by some one authorized to make a demand, and not by a mere stranger. But to constitute a demand in any case in which there was an existing duty to pay, and a dereliction of duty in withholding payment, no particular form of words is necessary, but it is sufficient if the language plainly indicates to the party that he is called upon now to perform that neglected duty.

6. JUROR; *Challenge Overruled; Not Error, in Case Stated.* A juror on his *voir dire* testified that he had neither formed nor expressed any opinion, and was without bias or prejudice. Two witnesses called at the same time testified that some months before they had heard him say that he was afraid defendant had got himself into a bad scrape; that he had

got his foot into it, or words to that effect. On reëxamination he denied any recollection of such statement. A challenge was overruled, and he served as a juror. On a motion for a new trial, several other witnesses testified that at different times they had heard similar statements. The juror denied making any such statements; asserted as to some of the witnesses that he was not on speaking terms with them, and had not been at the places named by them as the scenes of these conversations. Part of this testimony was oral, and part in affidavit. The trial judge overruled the motion, and sustained the qualification of the juror. *Held*, Under the peculiar character of this case, the fact that the questions involved were principally questions of law, and in view of the acts and conduct admitted and testified to by the defendant, and as the testimony was partly oral and partly in affidavit, that this court is not warranted in setting aside the judgment and granting a new trial because of this juror.

### *Appeal from Lyon District Court.*

PROSECUTION commenced against the appellant, *E. P. Bancroft*, by the *State of Kansas*, for the embezzlement of $9,000 of moneys belonging to the State Normal School, at Emporia, Kansas, being principal less three per cent. commission for the sale, and interest on sales, of normal school lands of the state of Kansas. The amended information filed herein originally contained three counts, but the second one was stricken out by the court, leaving the first and third counts standing. To the information was attached and made a part thereof, a schedule containing in separate columns a list of the lands sold, when and to whom sold, dates and amounts of payments on each tract of land, of principal less commission and interest. At the September Term, 1878, of the district court, the appellant was tried for the above embezzlement, found guilty, and sentenced to the state penitentiary for the term of five years. From this judgment he now appeals to this court. All necessary facts, pleadings and proceedings are sufficiently stated in the subjoined opinion.

*Ruggles, Scott & Lynn*, for appellant:

1. The district court erred in overruling defendant's motion to compel the prosecution to elect as between the first

and third counts of the information, and also in overruling his motion to strike out one of said counts. All criminal pleadings are to be judged by our code, and not by the rules of the common law, or decisions of courts thereunder. (Criminal Code, §§ 101, 102, 103, 123.) But viewed in the light of the common law, the defendant should not have been put on trial on these two counts. They cannot be said to be introduced solely for the purpose of meeting the evidence as it may transpire, the charges being for the same offense. This is a case not only of distinct felonies, but the counts set out distinct felonies, which are radically repugnant. *State v. Johnson*, 5 Jones (N. C.), 221.

The two offenses charged are in law just as distinct as if they were covered by separate sections of the statute; the fact that they appear in one section does not alter their legal character. It is absolutely impossible for a person, guilty of embezzlement of funds under the first clause, to be guilty of a criminal refusal to pay over funds collected as provided for in the second. The second clause was enacted for the purpose of reaching a class of individuals who were not and could not be punished under the first clause; a class of collecting agents who were not even civilly liable until after demand. It is true that a demand and refusal may be evidence of an embezzlement under the first clause, but it would not necessarily constitute the embezzlement; and then it will not be supposed that, in enacting this second clause, the legislature was simply putting in a statute of evidence in embezzlement cases. If, by the amendment of 1873, the legislature did not provide for two distinct felonies, and felonies that, so far as the same individual and the same funds are concerned, are as to each other inconsistent and repugnant, then we have in this amendment an indirect attempt to legislate out of existence the statute of limitations so far as embezzlements are concerned, for the addition clearly amounts to this and no more: "that whenever any agent, officer or servant mentioned in § 88, ch. 31, shall have embezzled any such moneys mentioned in said section, and shall neglect or

refuse to deliver to his employer, on demand, the same, unless the same shall have been lost by means beyond his control," etc., "or his employer has permitted him to use the same, he shall be committed," etc.

If this second clause does not make the things therein mentioned a crime, and the same did constitute a crime under the first clause, then it is an absurdity, or else the legislature simply meant to say, that if anyone has at any time been guilty of embezzlement under the first clause, he is to be convicted and punished, even though prosecution for this crime is barred by the statute of limitations, provided the demand mentioned is made, and the other things stated exist; and we cannot suppose the legislature intended any such thing. Now does not this third count amount to this: that although we charge Bancroft with embezzlement under the first count, he is not guilty thereof, but he is guilty by reason of the existence of a state of facts covered by this second clause? The two charges are repugnant, and they cannot, in the very nature of things, be predicated on the same funds — in law, just as repugnant as would be two counts for larceny or any other crime, the one charging the offense to have been committed in one county, and the same offense in another county. (1 Wharton's Crim. Law, § 419.)

Then, again, it is impossible that the defendant could have committed two offenses under this act — first, by *fraudulently converting* to his own use the money, for this offense would be complete at the moment of the conversion. Then is it possible that a simple demand, several months after the conversion, would add a new offense because the defendant failed to pay over on demand? But again, suppose on demand he had paid the money over: would that have exempted him from punishment for embezzling it several months before? Surely not. If this law should be thus construed, it would be a trap to catch the poor and least offending; while the sharp and wealthier rogue could always, when caught in his villainy, pay up and get out. Evidently the last clause of this act was intended to cover a new class of cases, such as

the embezzlement act did not before cover; and such is the history of the embezzlement laws since the first act was passed in England — every new one was intended to cover a larger class. This last clause was tacked to our act for the express purpose of catching a class of agents, such as lawyers, that could not be guilty of a conversion of money coming into their hands until demand was made; so, of course, a lawyer could not be convicted of embezzling his client's money, which he had collected, until demand was made; neither could the client maintain a civil action against his lawyer for money collected, until demand was made. It has been often decided that statutes of limitation never begin to run in favor of a lawyer until the client has made demand. Now, as Bancroft is not an agent upon whom demand should be made before suit is brought, it was therefore an error to convict him under the third count, as well as not to strike it out. (*Pierce, et al., v. Thornton,* 44 Ind. 235; *Voss v. Bachop,* 5 Kas. 59, and cases cited; *Green, Adm'r, v. Williams, Adm'r,* 21 Kas. 64.)

2. Judgment should have been rendered in favor of the defendant, on the issues joined on his plea in abatement in this court, and his motion to set aside the verdict and for a new trial should have been granted. Said verdict and decision were not sustained by the evidence; they were contrary to law, and grave error was committed by the district court in its instructions, in its refusal to give instructions requested during the trial of said issues, and in overruling said motion. (Dassler's Stat., p. 820, § 4253; 3 Kas. 250; 6 id. 370.) It is expressly admitted that Bancroft never was a fugitive from justice, and that neither the district court nor any judge thereof ever ordered the information herein, or any information, to be filed against him. On this issue the state had, or at any rate assumed, the burden of establishing by proof that the defendant had had a preliminary examination on the charges contained in the information filed, and for this purpose introduced in evidence the transcript of the docket of Bacheller, J. P., a warrant of arrest, and the complaint on which said warrant was issued. And this evidence, with the

above admission, and the admission that said transcript, warrant and complaint were the only ones ever made, issued or filed by or before said justice, and the only ones upon which defendant ever had an examination for the matters charged in said information, was all the evidence introduced.   It is therefore evident, that unless the charge contained in said warrant and complaint is the same in law as the charge contained in the information, the defendant never did have the preliminary examination, without which no information can be lawfully filed against him.

The information charges in the first count, that Bancroft was an agent and officer of the state of Kansas, and that as such he embezzled certain moneys belonging to said state, a corporation, without the assent of his employer, the state of Kansas, and is based on the first part of § 88 of the crimes act, or on that section as it existed prior to the amendment of 1873; while in the complaint before the justice, which is also wholly based upon the said portion of said § 88, Bancroft is charged with being *an agent of the board of regents,* and that as agent of said board he collected and had under his care, by virtue of *such* agency, certain moneys, and that he embezzled the same.   Now we insist, that neither in fact nor in law are these charges the same, and that the evidence required to sustain the charge made in the complaint would wholly fail to sustain the charge made in this count.

An allegation that Bancroft was an agent and officer of the state of Kansas is not in any legal sense an allegation that he is an agent of the board of regents, any more than a charge that Bancroft is an agent of John Doe is legally the same as a charge that he is the agent of Richard Roe.   If the difference is not apprehended at a glance, no argument will bring conviction.   If, however, we are in error, so far as this first count is concerned, and this court holds that the charge in the complaint is substantially the charge made in this first count, it certainly cannot be seriously contended that the crime attempted to be charged in the third count of the information is anywhere hinted at or pretended to be set forth

in this complaint. The whole charge before the justice was predicated upon said § 88 as it existed before the amendment of 1873. There is no language in this complaint capable of bringing the attempted charge within the purview or provisions of that portion of § 88 added thereto by the amendment of 1873. If this complaint will sustain the first count of this information — if the two charge substantially the same offense, or come within the same class of offenses — then it is nonsense to talk about this third count being based upon this complaint, because this third count does not charge an embezzlement by an agent or officer of moneys belonging to his employer, and without his employer's consent, or attempt to make any charge within the scope of the first portion of § 88 as it now stands; but said count is drawn entirely under the latter portion of said section — that part added thereto by the amendment of 1873. It ignores completely the language of the embezzlement clause of the section, and uses the precise words of the other clause. We therefore contend that Bancroft never did have a preliminary examination for the offense charged in this third count; that this section includes at least two distinct offenses, and that clear and prejudicial error was committed by the district court in reference to this plea. (*Meister v. People*, 31 Mich. 99–112; *People v. Jones*, 2 Mich. 315, 217, et seq.; *People v. Fox*, 3 Mich. 497.)

Again, we call the attention of the court to the warrant issued on said complaint, and which follows this complaint, except that it charges that the embezzlement was committed on the 6th day of *June, 1878*, while the complaint and the information (which was filed March 20th, 1878) charge it to have been committed on June 6th, 1877. Now we submit that, judged either by this complaint or this warrant, the defendant never had any preliminary examination for either of the offenses charged; and yet the jury, under the instructions of the court, found that he had, and judgment was rendered accordingly.

We also call the attention of the court to the fact that defendant requested the court to instruct the jury: "That an

·examination on a charge of embezzlement of money on June 6th, 1878, is not an examination for a charge of embezzlement on June 6th, 1877," and the court refused; and on this point charged the jury "that time is not an essential ingredient in the issues submitted to you, and the mere fact the warrant read in evidence before you states the offense to have been committed June 6th, 1878, and the complaint read in evidence before you states the offense to have been committed on June 6th, 1877, would make no difference, and you may find for the state, so far as that circumstance is concerned." This we think error. *State v. Sexton*, 3 Hawks (N. C.), 184; *State v. Litch*, — Vt. 67; *Mashley v. State*, 10 Mo. 291; *Serpentine v. State*, 2 Miss. (1 How.) 256; *State v. Pratt*, 14 N. H. 456; *State v. Woodman*, 3 Hawks (N. C.), 384; *Pennsylvania v. McKee*, Add. (Pa.) 33; *Joel v. State*, 28 Tex. 642; *Johnson's case*, 5 City H. Rec. 103. We do not claim that the warrant and complaint before the justice should describe the offense as accurately as the information, but we do insist that the charge made in the latter should be substantially the same as that made in the former.

3. The defendant's motion to quash the several counts in this information should have been sustained.

(a) In this information the defendant is charged with being an agent and officer of the state of Kansas, a public corporation, and that as such he was guilty of embezzling and criminally refusing to pay over $9,000, which had come to him by virtue of such agency and office. We contend that the state of Kansas is not included in the word "incorporation" found in § 88 of the crimes act, and that no agent or officer of the state can be guilty of embezzlement under said section. According to well-established rules of construction, words and phrases are to be construed according to the context and approved usage of the language; and certainly words used in a criminal statute are to be construed in their usual acceptation in common language. We have searched in vain for an instance in our statutes wherein the state is spoken of as a corporation, or where the legislature has ever indicated that the

word corporation should include the state. On the other hand, the statutes are full of instances where the legislature has enacted laws for the protection of state property, and for the punishment of those injuring or making way with it, in all of which the state is designated by the name of "state;" and we also find that when it is deemed necessary that the state should be included in some name that does not ordinarily include it, such intention is made manifest by express legislation. (Gen. Stat., ch. 31, § 314.) Now, when we find nowhere any clear indication that it was ever intended that the state should be included within the words "corporation," or "incorporation," but on the contrary, find that in all cases where it is evident the state's interest is sought to be protected by the provisions of the crimes act, the word "state" is used, except when, by the force of § 314, the state is held to be included within the word "person," how can it be claimed that in this particular § 88 a rare exception is made, and the sovereignty is wrapped up in the word incorporation?

We do not claim that a state is in no sense a corporation, but only that it is in no such sense one as to be ordinarily embraced within that word when found in statutes. It is a corporation in the same sense as a king is a corporation, and in no other. (1 Bl. Com. 469.) It has the legal advantage of perpetuity. It may sue in a foreign court; in a certain sense cede its sovereignty and be so far considered a corporation. (2 Johns. Cases, 422; 2 Hill, 159; 6 id. 36.) As is said in Angell & Ames on Corporations, § 15: "Nations or states are denominated by publicists bodies politic; and are said to have their affairs and interests, and to deliberate and resolve, in common. They thus become as moral persons, having an understanding and will peculiar to themselves, and are susceptible of obligations and laws. *In this extensive sense* the United States may be termed a corporation. . . . It may be so said of each state singly."

The question before the court is not whether, in the language of publicists, a state may be termed a corporation; but whether when the state was enacting this criminal statute for

the punishment of agents and officers of private persons and incorporations, it meant that the state was a corporation within that section? We believe that the legislature used this word in its ordinary legal sense, and attached to it no broader meaning than law writers generally do, and that it meant private and public corporations, and that it was legislating for the protection of its citizens, private persons, and of its own creations, corporations. If in the ordinary legal sense the state is a corporation, it is a public corporation, and it is charged in this information to be such. Now the state is the government, and by legal writers,·public corporations are defined to be those "*created by the government* for political purposes, *as* a county, a city, a town or·village." (Burrill's Dic., p. 352, title, *Public Corporations;* 2 Kent's Com. 275.) "They are invested with subordinate legislative powers, to be exercised for local purposes connected with the public good, and such powers are subject to control of the legislature of the state." (2 Kent's Com., marg. p. 275; 1 Dillon on Cor., § 10; Field on Cor., §§ 2, 3.) So, according to these eminent law writers, the words "public corporations" do not mean the state, but corporations subordinate to the control of the state; creations of the legislative will. Judge Dillon, in § 14, vol. 1, of his work on Corporations, says: "Although not styled such, each one of the United States, in its organized political capacity, is in effect a public corporation. Corporations, however, as the term is commonly used, do not include states, but only derivative creations owing their existence and powers to the state, acting through its legislative department," etc.

The argument seems to us clinched, and the conclusion put beyond all question, when we find that the legislature has expressly defined this word "corporations" in the very statutes in which § 88 is found, and in that definition excludes the state as effectually as if the enactment had been that "the state is not a corporation within the meaning of that word as found in these statutes;". and it makes the definition of the words "public corporations," as given by Burrill and Kent,

the law of construction of statutes in that regard in this state. In chapter 23 it is enacted, in § 1, that corporations are either, first, public, or second, private. In § 2, that "a public corporation is one that has for its object the government of a portion of the state." In view of this legislation, we ask, how can it be seriously contended that the word corporation, or incorporation, found in chapter 31, shall have some broader or other meaning than that given to the same word in chapter 23?

In so far as a state is a corporation, it is also a *person*. "Corporations are artificial persons, bodies politic, possessing some of the attributes of natural persons, and are subject to many of the obligations and duties imposed by law upon individuals." But it never has been held that, because in this sense a corporation is a person, when this word "person" is found in a statute it will be construed to mean or embrace a state. Its meaning may be extended by express definition so as to include the sovereignty, but unless so extended it will not be so considered; and the reason is, that "in construing a statute, words are to be taken in their ordinary sense, unless from a consideration of the whole act it appears that a different meaning was intended." As an example of this, we refer the court to § 314 of the crimes act, which provides: "When the term 'person' is used in this act to designate the party whose property may be the subject of any offense, such term shall be construed to include the United States, this state," &c. (52 N. Y. 534, *et seq.;* 94 U. S. 320, 321; 1 Bishop Cr. Law, §§ 224, 225, 249, 250, 272.)

If the state is included in this word in § 88, then the section is broad enough to and does cover all agents and all officers of the state, and certainly the state treasurer. Yet we find that the same legislature enacted a law which took effect at the same time that chapter 23 did (October 31, 1868), covering embezzlement in all cases by said officer, and this law prescribes a punishment, and one much greater than that fixed in said § 88. If the construction contended for by the prosecution in this case be correct, then we have this peculiar

condition of things all enacted into law by the same legisla-
ture and at the same time, viz., two sections covering identi-
cally the same case—a state treasurer liable for the same act
to one rule of punishment by said § 88, ch. 31, and to another
rule of punishment by § 56, ch. 102.

(b) The motion should have been granted, because, in fact
and law, the defendant never was the agent of the state of
Kansas as therein charged, but he was, on the contrary, the
agent of the board of directors of the normal school, who, it
is alleged, appointed him, and of its successors the board of
regents during such of the time named in the information as
such board had authority, under the law, to sell the school
lands.   By the act of 1872 (Laws 1872, ch. 189, § 1), the
board of directors was authorized to sell the normal school
lands, and by § 3 said board was empowered to appoint an
agent for the same purpose, who was to be at all times sub-
ject to the control and directions of said board, and who was
to receive such compensation for his services as said board
within certain limits might allow.   Our contention is, that
under the well-known and long-established rules of law per-
taining to principal and agent, these provisions constituted
such appointee the agent of the board of directors, and not
in any sense the agent of the state.   His selection and ap-
pointment were to be made by the board; he was to be subject
at all times to the control and directions of the board; he
was to give such security as might be approved by said
board, and the board was to fix and pay him compensation
for his services; and when selected and appointed, and his
bond or security approved, he became not the agent of the
state but the agent of the board; in the language of § 1
of said chapter, "their" (the board's) "authorized agent."
Even if we did not here have all the legal essentials to con-
stitute the relation of principal and agent between this board
and its appointees, and outside of any expression from the
legislature of its purpose and intention on the subject, a fair
doubt might arise as to whose agent the board's appointee
became; yet, when we find that the legislature, which created

the board, empowered it to sell the lands, and, if it saw
fit, to appoint an agent to do so also, in express terms and
unequivocal language speaks of this agent as *their agent,* and
nowhere intimates that he was to be an agent of the state, it
is certainly a forced and unnatural construction of the lan-
guage and evident intention of the legislature, to claim or
insist that he is not the agent of the board.   We submit that
the law, as it reads, settles this question. (18 Ohio St. 456,
462.)   Clearly, the fact that the state through its legislature
authorized the appointment of this agent, does not militate
against our claim that he was agent of the board, because
the power which authorized the appointment had full author-
ity to declare whose agent he was to be, and that power has
fixed his status, not only by the general terms of the act, but
also by express words. (*Regina v. Welch,* 61 Eng. Com. Law
Rep. 295.)

4. One of the essential ingredients necessary to be proved
by the state in order to justify a conviction under the third
count of this information, was a proper demand for the funds
collected, and we propose to show the court that there was
not only an absolute failure of proof on this point, but also
that the proof clearly demonstrated that no proper demand
was ever made.   If any demand was ever made, it was made
by Dr. Wright and J. H. Crichton, two members of the board
of regents, and who were appointed a committee to wait on
Bancroft; and this demand, if ever made, was made by these
persons about April 18, 1877, or March 2, 1878, or at both
these times.

[Counsel, after considering the testimony of Wright and
Crichton, together with the two resolutions passed by the
board of regents, upon which the committee was appointed
and acted, contended further:]

There is not, in the whole record, one word or scintilla
of evidence that this direction of the board was ever brought
to the notice or attention of Bancroft, either by word of
mouth or by writing, by this committee or any one else, or
that this committee or any one else ever demanded that

Bancroft pay over or deposit these moneys in the state treasury; and, therefore, admitting that language can be so distorted for the purpose of conviction in this particular case as to make these resolutions confer authority on this committee to make the requirement spoken of in the last one, nevertheless there is, as we have shown, an absolute failure of proof showing any demand, order or requirement coming from this committee, or any one else, to Bancroft to deposit these moneys in the state treasury.

And further: even if we are all wrong on this question of the authority of this committee, it will not be disputed that the proof must conform to the allegations. The charge is not that the board demanded that Bancroft should turn over the moneys to it, nor that a committee of the board demanded he should pay them over to it, but that the board demanded of him "that he pay over into the state treasury" said moneys. The only demand proven, or attempted to be proven, was, that he pay over the moneys to the *committee*. We submit that under the law Bancroft had no legal right to deliver these moneys, or any part thereof, to this committee, in response to its demand, or to any one else, or to do anything with them save to deposit them where the statute in express terms says they shall be deposited, (Laws 1872, ch. 189, § 4,) and had he been entirely innocent of any wrong-doing or intent, and, having the funds in his hands, paid them over in response to this demand, and any portion thereof had been lost or failed to reach the state treasury, he would have been responsible for the loss, and his bondsmen (if any he had had) would also have been liable. We claim that the law does not authorize any one to demand or receive this money except the state treasurer; the law has made him alone the custodian of these funds; he alone has given the bond and necessary security to answer for any default.

5. On the 13th day of March, 1873, the only persons or body of persons empowered by the state to sell normal school lands, or to appoint an agent to sell the same, were legislated out of existence (Laws 1873, ch. 135), and from

that ·time until the enactment of the "act to reorganize the· state normal school at Emporia, and to provide for the sale of its lands," which took effect March 13, 1877 (Laws 1877, ch. 179), no authority existed anywhere to do these things.·

After reviewing the legislation upon the subject of the Emporia normal school and the normal school lands, counsel claimed that when the act of 1873 was passed, the board of directors was abolished, the members passed into private life, and as by the acts of 1866 and 1872 the authority was conferred on the board to sell the lands and appoint an agent, when it passed out, the agent went with it; and that Bancroft was no more agent for the sale of endowment lands, after March 13, 1873, than were the gentlemen who composed the board of directors, prior thereto, still the board of directors. The power to sell these lands remained in abeyance until 1877, when the normal school was reorganized, and it was· made the duty of the board of regents to sell the lands under the provisions of the act of 1872. (Laws 1877, p. 236.) It certainly won't do to argue that because Bancroft assumed to act as agent, and on that assumption did sell lands and collect proceeds, that therefore he is estopped to set up this· claim, for whatever law there may be· in this idea, under any circumstances such law has no application when in law there· can be no agency; for the embezzlement of money by one in fact and law a servant or agent of another, when said agent or servant is not authorized to receive it, is not within the· statute, although the party paying it to him supposes he is so· authorized. (2 Whar. Crim. Law, §1942.) In that case as· in this, the money would not come to him by virtue of his· employment. Nor will it do to say that the act of 1873 only substituted the regents in the place of the directors so far as the government of the school was concerned, leaving this· board of directors in full life so far as the lands were concerned, and clothed with all the powers of the act of 1872, because the authority to sell was given to the board of directors of the school, and by the act of 1873 they ceased· to be· the board of directors. And even if this last idea has any

foundation, it would not assist the prosecution in this case, because the whole case, from beginning to end, was conducted and tried on the theory that the *regents*, and not the *directors*, had control of these lands.

6. We claim the court erred in refusing to quash the information, and to grant a new trial, and in failing to arrest the judgment, and refusing defendant's instructions because the defendant was only charged, proven and found guilty of embezzling money, when there is no law making any such offense. Section 88, p. 334, Gen. Stat., reads as follows: "If any clerk . . . shall embezzle or convert to his own use, or shall take, make way with or secrete with intent to embezzle or convert to his own use, without the assent of his master or employer, any *money*, goods, rights in action, or valuable security, or effects whatsoever, belonging," &c. Now, ch. 83, p. 177, Laws of 1873, was an act to amend the above § 88 of the crimes act, and is a literal copy of the latter, as far as it goes, except the words are "any goods, rights in action, or valuable security, or effects whatsoever, belonging," &c. Now, when we read on to the conversion part of the section, we find another class of articles mentioned, to wit: "Any money, promissory notes, evidences of debt, or other property which," &c. Then it continues, "he shall upon conviction thereof be punished in the manner provided in this section, for unlawfully converting such money or other property to his own use." It seems self-evident that the word "money" used in § 88, crimes act, had a different meaning from the words "goods," "rights in action," "valuable security," or "effects whatsoever," for it is a first principle of construction that a statute shall be so construed as to give every word a distinct and definite meaning. Now it may be argued that the word "goods" will include money; but when both words are used together, would any one so understand them? Certainly not. Then the second subdivision of ch. 104, p. 999, Gen. Stat., reads, "Words and phrases shall be construed according to the context and the approved usage of the language." To construe the other

words used in § 88 according to approved usage and the context, would be that they do not mean money. Then we can take it for granted that "money" has a meaning of its own not found in the other words and phrases of § 88. The last clause of first subdivision of ch. 104, Gen. Stat., reads: "The provisions of any statute, so far as they are the same as those of any prior statute, shall be construed as a continuation of such provisions, and not as a new enactment." To construe the first part of ch. 83, Laws 1873, where the word "money" is left out of the act, in accordance with this statutory rule, would be to give to the language adopted in the amendment the same meaning it had in § 88, with "money" omitted, and we would then have no punishment provided for unlawfully converting money to one's own use, and Bancroft was wrongfully convicted. It will not do to say the legislature made a mistake, and through accident left it out, for the courts of the country do not sit to make laws and supply omissions, accidental or otherwise, of the legislature. *Moon v. Mansert*, 5 Lans. (N. Y.) 173; *State v. Clark*, 57 Mo. 25; *Woodbury & Co. v. Berry*, 18 Ohio St. 456. See as to meaning of "goods," "chattels," &c., *Rex v. Beacall*, 1 Carr. and Payne, 454; 11 Eng. Com. Law, 448; *Johnson v. State*, 11 Ohio St. 324; crimes act, §§ 78, 90, 92.

7. The court certainly committed error in defining what is meant by a fraudulent conversion of money to commit the crime. The court said, in the hearing of jury: "If a party fraudulently converts property to his own use, the crime is completed, and he cannot be heard to say that he *intended no fraud*, and intended to replace the same. If he intended to commit the wrongful act complained of, it amounts to crime." In construing what the court meant in the instruction by fraudulent conversion, counsel for the state several times referred to the court's opinion above quoted, given during the trial. Now it remains to be ascertained whether the court, in the above-quoted opinion, gave a clear definition of what constitutes a fraudulent conversion.

Is it possible that if a party does the wrongful act of ap-

propriating another's money to his own use without the assent of the owner, he has been guilty of embezzlement? If this be law, then there are not a dozen business men in the United States who have not been guilty of the offense. Every man has at some time appropriated money and property of another to his own use without the assent of the owner. The very gist of all these offenses is the fraudulent design of the party appropriating the money or property to thereby increase his own estate to the loss of the estate of the owner; so it seems to us that the intent to cheat and defraud the owner is the very gist of this offense. So, if when a party appropriates the property he intends to replace it at once, and has the means to do so, and it never enters into his head that the owner shall lose anything, or the one appropriating shall gain anything thereby, surely there is no intent to defraud, and cannot be embezzlement.

Then, again, how a party can be guilty of a *fraudulent* conversion without an *intent* to defraud, beats us; yet the court said, "he could not be heard to say he intended no fraud." The intent is the very gist of fraud, in a civil action. (*Green v. Nixon*, 23 Beav. 535; 2 East. 108; Kerr on Fraud and Mistake, 42, 43; 2 Bish. Crim. Law, § 357.)

8. The court erred in refusing to allow Bancroft to answer the question showing why he did not make a full report of the lands sold, and in rejecting defendant's offer of proof; for certainly, if a criminal intent is necessary in embezzlement, the proffered explanation would have been strong evidence to rebut any inference to be drawn from Bancroft's failure to make a full report. This seems too plain for argument.

*Willard Davis*, Attorney General, for The State:

1. Does § 88, ch. 83, Laws 1873, charge two separate and distinct offenses? The first and third counts of the information are not in conflict with each other. They do not state two distinct offenses, but they state distinct conditions under which the one offense of embezzlement may be committed.

By proving the facts applicable to either condition, the accused may be convicted of the offense; or by proving the facts applicable to both conditions, he may be convicted as in the case at bar. The first condition of the law is found in the first part of § 88, ch. 83, laws of 1873, and the second condition, in the last part of said section ( . . . "or, if any agent shall neglect or refuse," etc.)

These distinct conditions of the law run to the same offense, and are in perfect harmony. The jury found the defendant guilty of embezzling two separate and distinct sums of money. Under the first count he was convicted of embezzling $3,436.18, for which there had been no demand, and none was required by the law. Under the third count he was convicted of embezzling $1,987.24, which he neglected and refused to pay over on demand, as required by that part of the statute on which it was founded. But if this view of the statute be incorrect, and it be true that the legislature in amending the law intended to create two distinct felonies, yet the judgment cannot for this cause be set aside, because the defendant was properly convicted on either and on both counts, and was not sentenced for embezzlement on different counts, but the penalty pronounced was five years' imprisonment, being the maximum limit of imprisonment for committing the acts denounced in either count, and the rights of defendant were not thereby prejudiced.

2. Counsel quoted the first count in the information and also the third count therein, giving each *in extenso*, and in like manner the complaint and the warrant issued thereon, and argued that the charge in this count and that in the complaint and warrant are the same. The warrant and complaint contain the two essential charges: 1st, that E. P. Bancroft had embezzled and converted to his own use a certain sum of money; 2d, that said money belonged to the state of Kansas. It was not necessary to state in the warrant the capacity in which he did it. It is well established, that the same particularity of description and statement is not required in a complaint or warrant that is required in

the information — the office of the complaint and warrant being merely to bring the accused into the proper court for trial on the general charge, without reference to the details of manner of commission, and the capacity in which the accused may have acted. In this view of the law, it makes no difference that the accused in the complaint is charged as being an "agent of the board of regents," when he was in fact the agent of the state. The first count alleges, that the defendant converted the said money to his own use, "without the assent of the state of Kansas, or of any other person or persons thereto lawfully authorized;" "that said embezzlement was concealed by said defendant . . . till the month of February, A. D. 1878." The third count alleges, that demand was made on defendant for the money, and that he "failed, neglected and refused" to pay it into the state treasury; that said money was not lost by means beyond defendant's control before he had opportunity to make delivery thereof; that his employer did not permit the defendant to use said money, or any part thereof, and that the defendant concealed the fact of his crime until the month of February, 1878.

The complaint and warrant both charge fully the crime of embezzlement, and it was not necessary to allege in either the fact that a demand had been made, etc., for these are facts which are only required to be alleged in the information, because they must be proven on trial, and are not necessary in the examination.

3. Is the state a corporation within the meaning of the embezzlement act in question? For the purposes of owning, holding and controlling property, the state is a corporation; and while exercising its power over property, the fact that it is known by the same name as when exercising its sovereignty, does not negative the idea that it is a corporation. The mere fact that the legislature has not declared that the state of Kansas is a corporation, does not negative the idea that it is a corporation for purposes embraced in the act under consideration. It was not necessary for the legisla-

ture to declare that the state is a corporation. The very nature of its functions in reference to property proves that it is a corporation within the meaning of the statute in question. The state has two classes of functions. The first may be termed its sovereign power, the second its corporate power. The sovereignty is not wrapped up in the corporate power. The corporate power may be a part of the sovereignty. The fact that the state, in exercising certain corporate powers, is not called a corporation, does not negative the idea that in using such powers, which are common to all corporations, it is itself a corporation. The fact that the state is not commonly called a corporation, does not negative the fact that it is a corporation in the sense used in the statute in question, any more than the fact that because a county is not commonly called a corporation, it is not therefore a corporation. The fact that the term corporation, as commonly used, does not include a state, does not disprove that for certain purposes it is a corporation.

[Counsel cited § 15 of Angell & Ames on Corporations; § 2, ch. 23, and § 314, ch. 31, of Gen. Stat., and contended that there is nothing therein at variance with the foregoing views.]

However, should the court determine that the state is not a corporation within the meaning of the statute, the defendant must be held as properly convicted on the third count, which is based on the last part of said section, which applies to "any agent," which term must include all agents of the state, whether viewed as a sovereign or as a public corporation, in the sense admitted by counsel for defendant. The term must refer to any person, corporation, employer or power (of whatever name) which is not only capable of having an agent, but must perform its duties by an agent. The state need not be divested of its sovereign character, in order to own and control property.

4. The court did not err in saying in the hearing of the jury: "If a party fraudulently converts property to his own use, the crime is completed, and he cannot be heard to say that he intended no fraud, and intended to replace the same.

If he intended to commit the wrongful act complained of, it amounts to crime." This is the law, and it has been so held in *Commonwealth v. Tuckerman*, 10 Gray, 173. See, also, *State v. Healey*, 48 Mo. 531. These authorities were read by the court before he uttered the words above referred to. These words of the court are its decision sustaining the objection of the state to a question of defendant's counsel put to him, as to whether, at the time he used the moneys mentioned in his "plat report," "he intended to defraud the state of Kansas or the state normal school." This same idea, advanced by the court and sustained by these authorities, is embodied in the tenth instruction.

*Gillett & Forde*, special counsel for The State:

On the argument in the court below, the counsel for the defendant made four points against the validity of said information, viz.: 1st, the state of Kansas is not a corporation within the meaning of ch. 83, Laws of 1873; 2d, the information charges the defendant with the embezzlement of moneys: the word *moneys*, which existed in original section 88, crimes act, is omitted in this chapter 83, Laws of 1873; 3d, chapter 135, Laws 1873, revokes the agency of Bancroft; 4th, Bancroft had, by reason of commissions, a joint interest in the moneys. The language of the embezzlement statute, § 1, ch. 83, Laws 1873, is: "If any officer, agent, clerk, or servant of any incorporation, or any person employed in such capacity."

Is the state such a corporation as is contemplated by statute? The state acts and is endowed with a dual capacity. In its political action it is a sovereign, but in its business, financial, and property-owning and operating capacity, it is to all intents and purposes a corporation, as much as a railroad company or a bank. It has perpetual succession, and is represented only by its agents. "Nations or states are denominated by publicists bodies politic, and are said to have their affairs and interests, and to deliberate and resolve, in common. They thus become as moral persons, having an understanding

and will peculiar to themselves, and are susceptible of obligations and laws. In this extensive sense the United States may be termed a corporation. They are a collective, indivisible body, which can act and be seen only in the acts of those who administer the affairs of the government, and also their agents duly appointed. So it may be said of each state singly; so the king of England is a corporation, and so is parliament." (Angell & Ames on Corp., § 15, and from § 6 to § 15 inclusive.) "Although not styled such, *each one of the United States*, in its organized political capacity, is in effect a public corporation. Corporations, however, as the term is commonly used, do not include states, but only derivative creations, owing their existence and powers to the state, acting through its legislative department. Like corporations, however, a state, as it can make contracts and suffer wrong, so it may for this reason, and without express provisions, maintain in its corporate name actions to enforce its rights and redress its injuries." Dillon on Munic. Corp., § 14, and cases cited; *Delafield v. Illinois*, 2 Hill (N. Y.), 159, 162; 26 Wend. 192; 8 Paige, 531; *Indiana v. Noram*, 6 Hill (N. Y.), 33; *State v. Delesdenier*, 7 Tex. 76; *People v. Assessors*, 1 Hill, 620. See also, *The State v. Smith*, 13 Kas. 292, 293.

It seems to us that the understanding and intent of the legislature must have been, that all officers and agents of any individual, partnership, incorporated company, or public corporation, including the state, were included in the embezzlement law of 1873. If, as was decided in *State v. Smith*, a county officer is included in that law, and is liable for embezzling county money, where is the distinction to be drawn in reason which shall allow a state officer or agent embezzling state money to escape? Is not the reason which requires the punishment of the county officer for embezzling county moneys, equally conclusive when applied to the case of an agent of the state for embezzling its moneys? Is the one any less a crime than the other? The county treasurer is the agent of the state to collect state tax. (2 Kas. 61.) The legislature must have known that the state, in performing its

vast corporate functions, must own property; must receive and dispose of property, both real and personal; must collect and pay out moneys, and build buildings, and have a multiplicity of transactions; that in the performance of all these corporate acts, it must be represented by its agents; that these agents must handle and disburse its moneys; must sell and dispose of its vast property; receive and receipt for the moneys derived from the sales thereof; and execute conveyances, bills of sale, and acquittances. And if a criminal law is to be applicable to a county, city, township or school-district officer, for a malperformance of his duties, why should an agent of the state be exempted from the operation of the same general law? Is human nature any nearer perfect in the one position than the others? Does a dishonest or corrupt county officer, whom the chances of politics may seat in a state office, become thereby regenerated?

We apprehend that, by the general language of the embezzlement law of 1873, the legislature intended to cover all cases of embezzlement by any officer, servant or agent of any body, from the sovereign state to the private individual; that it was the wrong they intended to punish, by whosesoever agent committed. The legislature never intended to offer a premium on embezzlement of state funds. The legislature has nowhere provided any criminal law other than the general law of embezzlement as being specially applicable to these several agents of the state, or to any agent of the state, except the state treasurer; and the law applicable to him (§§ 56, 57, pp. 983–4, Gen. Stat.) makes no substantial change in the general embezzlement law, except to increase the punishment. This fact, we think, tends very strongly to the conclusion that the legislature considered every other embezzlement except by the state treasurer as covered by the general embezzlement law of 1873, and his embezzlement was only provided for in a separate law so as to increase the punishment; (and it is very questionable, under the rulings of this court, if that state treasurer embezzlement law will stand

13 — 22 KAS.

the constitutional tests under the rules laid down in *Bailey v. Comm'rs Sedgwick Co.*, and *Swayze v. Britton;*) so that in an information against a state treasurer, the prosecution might have to proceed, if at all, upon the general embezzlement law of 1873. It will be observed that the embezzlement statute of 1873 consists of two parts, the first part of which we have discussed, and it seems to us that the state is included within the term "corporation," as used in the first part of said law. The second part proceeds: "Or if any agent shall neglect or refuse to deliver to his employer or employers, on demand, any money, promissory notes, evidences of debt, or other property which may have come into his possession by virtue of such employment, after deducting his fees as attorney, charges as agent, or stipulated commission for making collection of such money, unless the same shall have been lost by means beyond his control, before he had opportunity to make delivery thereof to his employer or employers, or the employer or employers have permitted them to use the same, he shall, upon conviction thereof, be punished in the manner provided in this section for unlawfully converting such *money* or other property to his own use."

The original first count was based on the first part of the section, and the original third count was intended to be based upon the portion above quoted, which is an addition to our old law.

It seems to us that under this third count (the second was stricken out by the court below), there can be no question that the legislature intended to gather in agents of the state, as well as anybody else. The language is as broad as it can be made, "or if any agent," etc. The term "agent," as there used, is not limited, nor is it attempted to be limited, by any words, but it is expanded to the fullest extent of our language. *Any agent*, as there used, means every kind of an agent, and an agent of anybody or everybody who is capable of being represented by an agent. The state can be represented in no other way than by agents—therefore an agent of the state

must be included in the term *any agent*, as there used. · The third count charges that the defendant was acting as agent, etc. This is sufficient. (Bishop Crim. Law.)

The second point made is, that in the statement of the things of which embezzlement may be committed, in the first part of said section, to wit, "secrete with intent to convert to his own use, without the assent of his employer, any goods, rights in action, or valuable security or effects whatsoever, belonging," etc., the word "money" is omitted. It will be observed that the word "money" was contained in the Compiled Laws, and also in the General Statutes, but omitted in the act of 1873. This, it is claimed, evinces an intention on the part of the legislature to take *moneys* out of the list of property of which embezzlement can be committed. In other words, to enact severe penalties against embezzling those things which are seldom embezzled, and to make the embezzlement of money, which is about the only thing that embezzlement is committed of, no crime. This construction can hardly be seriously contended for in this court. We suppose that the word "money" was inadvertently left out of the law of 1873, as the context shows clearly that the legislature supposed and understood money to be included. (See end of section.) When it uses the language, "he shall, upon conviction, be punished in the manner provided in this section for unlawfully converting *such money* or other property to his own use," the words refer to those things stated in the first part of the section, of which embezzlement may be committed, viz., "any goods, rights in action, or valuable security or effects whatsoever," showing that they are all meant; and if we are wrong in this, the word "moneys" is included in the term "effects," anyway. (See Bouvier's Law Dic., title, *Effects;* Web. Dic.; Worces. Dic.)

Besides, this very question was squarely presented to this court in the case of *The State v. Smith,* supra, and also in the cases presented with it, viz., *The State v. Calvin H. Graham,* and *The State v. Sidney S. Smith,* 13 Kas. 299, 300. In each of these cases, the information alleged the embezzlement by

the defendant, of moneys. In each case, a motion to quash was filed, on the ground, among others, that the information did not state facts sufficient to constitute a public offense. In the first case, the court below overruled, and in the last two cases the court below sustained, the motion to quash, and the state appealed. This court reversed the orders of the court below in the last two cases quashing the informations, thus holding that embezzlement of money could be committed. This question concerning the omission of the word "money" from the law of 1873 was argued in the Coffey county case, and pressed upon that court, and the same question was presented and argued in this court in the brief of the then county attorney of Coffey county, who took that case up. In that case, the embezzlement was charged to have been committed after the law of 1873 took effect, and the second squarely raised this question; and the county attorney's brief names this as one of the points *made* in the court below why the information ought to be quashed, and it was quashed in the court below; and this court reversed the order of the court below quashing it, and thus holding that the said information under the act of 1873, charging the embezzlement of money, was a good information so far as this question is concerned.

As to defendant's plea in abatement, which plea was tried by a jury, which upon the issues joined, found for the state: we think no error was committed therein by the court below. No technicality is required in a preliminary examination. The examination in this case was undoubtedly sufficient to fully notify the defendant of the general nature of the charges to which he was expected to answer. (*The State v. Smith,* supra.) The demand was well proved. The defendant deliberately made a statement for the board at the time he turned over the $2,800 that that amount was all he had received; that the list was all he had sold of the lands, when he then held and had used about $7,000, which was unaccounted for at that time. That he turned over this $2,800, and stated it to be a full statement and settlement, estops him

in any event from denying that a demand was made. In appellant's brief ( p. 24. XI ), the court refused to allow Bancroft to answer a question showing why he did not make a full report of the lands sold, etc.. This was not error. *Commonwealth v. Tuckerman*, 10 Gray (Mass.), 173.

The third point made is, that chapter 135, Laws 1873, revokes the agency of defendant; that up to that time the normal school was governed and managed by a board of directors; that if defendant was appointed by the board of directors in 1872, this law of 1873, changing them to regents, annulled everything, and wiped out all appointments previously made. We do not so understand it. Their duties were not changed. It was simply a change in name of the management. The board of directors were the agents of the state, and a new general agent, styled board of regents, appointed in their place. The defendant, sub-agent of the state, was not displaced any more than a local agent of an insurance company would be who had been appointed by a general agent who had been relieved by the parent company. The law did not attempt to repeal the law of 1872, authorizing the sale of normal school lands.

The opinion of the court was delivered by

BREWER, J.: At the September term of the district court of Lyon county, Kansas, for the year 1878, the defendant was tried, found guilty, and sentenced to the state penitentiary for the term of five years. The information filed against defendant originally contained three counts, the first of which charges:

"That in May, 1872, one E. P. Bancroft was, by the board of directors of the state normal school at Emporia, duly appointed as agent for the sale of said state normal school lands, and continued to be such agent until June 6, 1877; and that during all of said time, by virtue of such appointment as such agent, he was an agent and officer of the state of Kansas, a public corporation; that from day to day during said time said Bancroft, as agent, received, collected, and took into his possession and under his care, in

said capacity as agent and officer of the state of Kansas, about. $13,270.14, derived from the sale of certain of said normal school lands particularly described in said information, and which had been sold by said Bancroft as such agent, and which money belonged to the state of Kansas; and that of this sum, Bancroft, on June 6, 1877, at Lyon county, Kansas, unlawfully, fraudulently and feloniously embezzled and converted to his own use the sum of $9,000, without the assent of said state of Kansas, his employer, or of any other 'person or persons' thereto lawfully authorized, and that said embezzlement was concealed by Bancroft until February, 1878."

The third count is similar to the above, except that instead of charging the fraudulent and felonious embezzlement of said moneys, it charges:

"That on said June 6, 1877, said Bancroft had in his possession and under his control all of said $13,270.14, except $——, viz., $9,000, after deducting all his stipulated commissions; that on said day the board of regents of said school demanded of Bancroft (they being thereto lawfully authorized by the state of Kansas, his employer in said agency) that he pay over into the state treasury said sum of $9,000, which Bancroft failed, neglected and refused, and still does fail, neglect and refuse to do, and that he never has paid said sum or any part thereof into said treasury; that said sum and no part of it has been lost by means beyond said Bancroft's control before he had an opportunity to make delivery thereof to his said employer; that his said employer has not and did not permit him to use said moneys or any part thereof; and that Bancroft concealed the fact of his said crime and of his having said moneys until February, 1878."

The district court required the state to elect as between the first and second counts in the information, and the state elected to proceed upon the first and third counts, and said second count cuts no further figure in the case.

A motion was then made by defendant, to compel the prosecution to elect upon which of the remaining counts (the first and the third) it would proceed, and to strike out the other on the grounds—1st, that said information as it then stood did not state the facts constituting a public offense, in plain and concise language, without repetition,

·etc.; and 2d, that said counts were improperly joined. The motion was overruled by the court, and defendant excepted.

Defendant then interposed a motion to strike one or the other of said counts from said information, which was also ·denied, and defendant excepted.

Then followed defendant's motion to quash each of said counts, on the ground that neither of them stated facts sufficient to constitute a public offense; and that neither count was direct and certain as to the offense charged. This was ·also overruled, and an exception duly taken by the defendant.

Thereupon said defendant filed his plea in abatement, duly ·verified, alleging that he had never had any preliminary ex·amination for the pretended offense charged, or attempted to be charged, in each of said counts, or in any form waived the ·same, etc. To this plea the state interposed a general denial. The issue thus joined was tried before a jury, verdict was ·rendered for the state, and judgment for the state was entered thereon, after the motion of defendant for a new trial had been overruled and exception taken.

The defendant standing mute and refusing to plead, the ·court ordered a plea of not guilty to be entered for him as to ·each count.

The jury found the defendant guilty of embezzlement as ·charged in each of said counts, and found the amount embezzled under said first count to be $3,436.18, and under the third count to be $1,987.24; and thereupon the court adjudged that said Bancroft is guilty of embezzlement as found in said verdict, and that he be taken hence to the penitentiary of the state of Kansas, and there confined at hard labor for the full term of five years, etc.

The statute under which this prosecution was had is the ·amendment made in 1873 of § 88 of the crimes act, Laws 1873, p. 177, § 1, which reads:

"If any clerk, apprentice, or servant of any private person, ·or of any copartnership, except clerks, apprentices and servants within the age of sixteen years, or if any officer, agent, ·clerk or servant of any incorporation, or any person employed

in such capacity, shall embezzle or convert to his own use,. or shall take, make way with, or secrete with intent to convert to his own use, without the assent of his employer, any goods, rights in action, or valuable security or effects whatsoever belonging to any person, copartnership or corporation, which shall have come into his possession or under his care by virtue of such employment or office, he shall, upon conviction thereof, be punished in the manner prescribed by law for stealing property of the kind or value of the articles so embezzled, taken or secreted; or if any agent shall neglect or refuse to deliver to his employer or employers, on demand, any money, promissory notes, evidences of debt, or other property which may have come into his possession by virtue of such employment, after deducting his fees as attorney,. charges as agent, or stipulated commission for making collection of such money, unless the same shall have been lost by means beyond his control before he had opportunity to make delivery thereof to his employer or employers, or the employer or employers have permitted him to use the same, he shall, upon conviction thereof, be punished in the manner provided in this section for unlawfully converting such money or other property to his own use."

It is evident that the first count was framed under the first part of this section, and the third under the latter part, and that upon this section the principal question is whether the state is an incorporation within the meaning of that term as here used. It is conceded that there is a certain sense in which a state is a corporation, and properly so denominated. But the contention is that it is not so in the ordinary legal sense of the term, and even if it were, the legislature has by its express definitions excluded it from the scope of the term as used in the statutes. An examination of the authorities will show in what sense the state is called a corporation, and to them we turn. In Angell & Ames on Corporations, § 15,. it is said:

"Nations or states are denominated by publicists bodies politic, and are said to have their affairs and interests, and to deliberate and resolve, in common. They thus become as moral persons, having an understanding and will peculiar to themselves, and are susceptible of obligations and laws. In this extensive sense the United States may be termed a cor-

poration.    They are a collective, indivisible body, which can
act and be seen only·in ·the acts of those who administer the
affairs of the government, and also their agents duly appointed.
So it may be said of each state singly; so the king of England
is a corporation, and so is parliament."·

So in Dillon on Municipal Corporations, vol. 1, § 14:

"Although not styled such, *each one of the United States*, in
its organized political capacity, is in effect a public corpora-
tion.    Corporations, however, as the term is commonly used,
do not include states, but only derivative creations owing
their existence and powers to the state, acting through its
legislative department.·  Like corporations, however, a state,
as it can make contracts and suffer wrong, so it may for this
reason, and without express provisions, maintain, in its cor-
porate name, actions to enforce its rights and redress its in-
juries."

Thus, according to Angell & Ames, it is only in *an exten-
sive sense* of the term that the state may be called a corporation,
and according to Dillon the term as *commonly used* does not
include a state.    So, while a state is recognized as possessing
corporate character so far as to give it status as a plaintiff in
the courts of a sister state, ( *Woodworth v. Janes*, 2 Johns.
Cases, 417; *Delafield v. Illinois*, 2 Hill, N. Y., 159; *Indiana
v. Noram*, 6 Hill, N. Y., 33,) or in its own courts, (*State v.
Delesdenier*, 7 Tex. 76,) yet it seems to be so recognized only
in a limited sense, and for certain purposes.    It is not broadly
and generally called a corporation, or classed with such crea-
tions of the law.    Again, in so far as a state is a corporation,
it is also a *person*.    "Corporations are artificial persons —
bodies politic, possessing some of the attributes of natural
persons, and are subject to many of the obligations and duties
imposed by law upon individuals."    But it has never been
held that because, in this sense, a corporation is a person, that
when the word "person" is found in a statute it will be con-
strued to mean or embrace a state.    Its meaning may be ex-
tended by express definition so as to include the sovereignty,
but unless so extended it will not be so considered; and the
reason is, that "in construing a statute, words are to be taken
in their ordinary sense, unless, from a consideration of the

whole act, it appears that a different meaning was intended." As an example of this, we refer to § 314 of the crimes act, which provides: "When the term 'person' is used in this act to designate the party whose property may be the subject of any offense, such term shall be construed to include the United States, this state," &c. See *In re Fox*, 52 N. Y. 534, et seq.; *United States v. Fox*, 94 U. S. 320, 321.

These general considerations indicate that the state is not included within the terms "incorporation" and "corporation," as used in this section, for while it is true of all statutes, it is especially true of penal statutes, that no strained or exceptional interpretation is to be given to their language for the sake of including offenses not apparently within the purpose of the legislature in their enactment. We must, as a rule, keep within the ordinary meaning of words and phrases in construing criminal statutes, for otherwise the courts will be making those acts offenses which the law-making power has not declared to be such.

But we are not left to mere general considerations and rules of interpretation. The legislature has in terms defined the meaning of the word "corporation," and such definition must be accepted as conclusive. It was this definition which justified this court in the case of *The State v. Smith*, 13 Kas. 292, in holding that a county treasurer was included within the section — a conclusion reached with some hesitation, and one not altogether in harmony with decisions elsewhere. This definition, which was broad enough to make the term "corporation" include a county, as plainly makes it exclude the state. It is a definition given by the same legislature which enacted the original § 88, and must be taken as its understanding of the scope of the word as it is used in said section.

In ch. 23 of the General Statutes it is enacted:

"SEC. 1. Corporations are either — first, public; or second, private.

"SEC. 2. *A public corporation is one that has for its object the government of a portion of the state.*"

This first section is comprehensive: it includes all corporations, and divides them into two classes. There can be no pretense that the state is included within the second class. In no sense is it a private corporation, neither does it come within the definition of the first class. "The government of a *portion* of the state" is the language. Now the greater may sometimes include the less, but never the less the greater. An organization whose object is the government of the state as a whole, is not included within a term which is limited to those organizations whose object is the government of only a portion of the state. In other words, the legislature has expressly said that in using the term "public corporation," it means only those limited and local organizations, such as counties, cities, etc., to which it intrusts the government of portions of the state. With such an express affirmation of its intent in the use of the term, it would be simply an usurpation for the courts to hold that the term includes something more.

Supporting this conclusion, if it needs any support, it may be remarked that the same legislature made provision for the punishment of any embezzlement by the state treasurer, defining the offense and imposing a penalty therefor. (Gen. Stat., p. 983, § 56.)

Again it had, as already noticed, expressly included within the word "person" the United States, this state, etc. Yet when it used this word in said § 88, it chose to limit it by prefixing the term "private," as though it would not extend the scope of that section to the United States or the state. It was an unnecessary prefix, unless it intended a limitation which would exclude that which it is now contended should be included. It adds no force to the statute except by way of limitation, and it would be strange if the legislature had taken pains to limit one descriptive term, broad enough to include the state but for such limitation, and at the same time had intended that another descriptive term used in the same section not generally broad enough to include the state and which it had so defined as to exclude the state, should, with-

out any intimation of its being used with an extended mean-
ing, be so construed as to include the state.   The conclusion
then to which we are forced is, that the state is not included
within the terms incorporation and corporation
as used in this section, and therefore that the
first count in the information states no offense
under the statutes.   This avoids the necessity of
examining many of the questions presented and discussed by
counsel.

1. The state not
a corporation
within § 1,
ch. 83, Laws
of 1873.

The third count, as we have seen, was framed under the
latter portion of the section, and it is insisted that its lan-
guage is broad enough to include an agent of the state.   We
quote from the brief of counsel : "The term 'agent,' as there
used, is not limited, nor is it attempted to be limited, by any
words, but is expanded to the fullest extent of our language.
*Any agent,* as there used, means every kind of an agent, and
an agent of anybody or everybody who is capable of being
represented by an agent.   The state can be represented in no
other way than by agents — therefore an agent of the state
must be included in the words *any agent,* as there used.
The third count charges that the defendant was acting as
agent, etc.   This is sufficient."   It must be conceded that
the expression, "any agent," is broad enough to include an
officer or agent of the state, though the words
agent and employer are not apt or ordinary to
express the relations of a public officer and the state.   We
had occasion to consider the force of the term employer, as
used in this section, in the case of *The State v. Smith,* supra,
and held that its use was not so inconsistent with the relations
of an officer to the public as to prevent the application of
the statute to public officers.   It follows, therefore, that if
the latter part of this section stood as a separate and inde-
pendent act, its language would properly be held to include
an officer or agent of that state, and the third count would
have to be sustained.   What effect, then, does its position as
a part of a section have upon it, and how far do its relations
to the entire section limit and control its extent?   The car-

2. Sec. 1, ch. 83,
Laws of 1873,
construed.

dinal canon of construction is, that the intent,
when ascertained, governs; so that all mere rules
of interpretation are subordinate.    Summing up
his remarks on this, Chancellor Kent says: "It will be sufficient to observe generally that the great object of the maxims
of interpretation is, to discover the true intention of the law;
and whenever that intention can be indubitably ascertained,
and it be not a violation of constitutional right, the courts
are bound to obey it, whatever may be their opinion of its
wisdom or policy." (1 Kent's Com. 468.)

The question is one of difficulty.    Evidently the words
"any agent" mean exactly "any agent," and include every
agent, whether of an individual, a partnership, a corporation
or a state, who does the acts thereafter named, or they mean
only such agents as have been previously enumerated in the
section.    Either construction is exposed to objections which
are not easily answered.    In support of the latter construction, it may be said that it is a rule of interpretation that,
"where particular words are followed by general ones, the
latter are to be held as applying to persons and things of the
same kind with those which precede." (Potter's Dwarris on
Statutes, p. 236, and cases cited in note.)    Having once indicated by the particular words in respect to whom or what it
is legislating, further particularity is unnecessary, and general
terms and phrases may be used without extending the legislation to any other person or things.

Again, it may be said that this section in the Laws of
1873 is an amendment of § 88 of the crimes act, the
amendment consisting in the addition of this latter part
under which the third count is framed; and the fact that it
is an amendment, indicates its purpose and extent.    It is not
to be considered as an independent act, creating, defining and
punishing an offense.    Words and sentences added to a section by way of amendment are added to limit, extend or
qualify that which is already in the section.    We must look
to the original section and compare it with the amendment,
to determine what error or omission the latter was intended

3. Intent, when
  ascertained,
  governs.

to remedy and that interprets its scope and effect. In a section defining and prescribing a penalty for a crime, an amendment may be in respect to the person, the offense, the evidence, or the punishment. It may enlarge or limit the number of persons capable of committing the offense; it may define the offense more fully, or include or exclude certain acts; it may declare the effect as evidence of any act or word; and it may increase or diminish the penalty. Now when the obvious purpose of the amendment is a change in any one of these respects, the language must be construed so as to carry into effect that purpose, and not in either a broader or more limited sense than it would receive in an independent act. Thus in the case at bar, if the obvious purpose was to enlarge or limit the penalty, that purpose interprets the language, and the use of general phrases and expressions should not be construed as extending the offense or increasing the number of persons capable of committing it. If the amendment of 1873 had read that, "All persons guilty of embezzling, converting to their own use, or secreting with intent to convert," &c., "shall be punished by imprisonment and hard labor not less than five years," &c., it would be evident that the thought of the legislature was on the penalty, and that it was not the intent to define the offense or include within the statute any other acts or persons than before. Now an examination of the amendment actually made indicates that the purpose was to enlarge the offense, by extending it to the case of an improper failure or refusal of an agent to pay or deliver to his employer on demand moneys, property, etc. Is not that all that the amendment intended? And should any general words be held to extend the statute to agents generally, or should they not rather be construed as referring to such agents only as have been previously enumerated? On the other hand, it may be said that the intent is to be gathered from the words; that if the legislature had intended to limit this provision to the agents previously enumerated, it would naturally have said "any such agent," and that, failing to use that or some similar term, and in fact using the comprehen-

sive expression "any agent," it intended to include every agent. Again, the rule concerning the limitation of general by prior particular words is not of absolute, controlling force, but always yields to the manifest intent. Indeed, does the rule extend to cases where in one clause certain acts and conduct are imputed to a particular class of persons, and in a subsequent clause different acts and conduct to a more comprehensive class, or is it not limited to cases where the general follow the particular words in the same clause as mere additional terms of description, and where the same acts and conduct are ascribed to, or affirmed of all? Further, an amendment may extend the original section in all respects, both as to persons, offense, evidence and penalty, and unless this amendment extends to persons as well as offense, it has but a limited and narrow application. Obviously the amendment was intended to reach such agents as attorneys, collecting agents, etc., who collect money for their principals, and to make their improper failure to pay on demand a crime. Now if no persons are included save those enumerated in the first part of the section, it would seem that only the attorneys or collecting agents of corporations were reached, for within the terms "clerk, apprentice or servant," (which are the only terms used in that part of the section with reference to any other agents than those of corporations,) an attorney or collecting agent would not properly fall. Can it be that the legislature intended by this amendment to reach only the agents of corporations? And again, if a mere enlargement of the offense was alone intended, why not, as would be natural, the statement of the act to be prohibited injected into the body of the original section to run along with the other acts prohibited, after the persons and before the penalty, instead of being a complete and separate statement both as to persons, offense and penalty?

The conclusions to which we have now come are with the considerations last named. While this stands as an amendment of a section, it is complete in itself. It names the persons, describes the offense, and affixes the penalty. It was

doubtless aimed at lawyers and such other collecting agents as are not liable to even a civil action until after demand, and its language was purposely made general, to include all such agents, for whomsoever they were acting. We make this extract from the argument of counsel for appellant, which, while directed to another question, tends to support the conclusions above reached:

"The two offenses charged are in law just as distinct as if they were covered by separate sections of the statute; the fact that they appear in one section don't alter their legal character. It is absolutely impossible for a person guilty of embezzlement of funds under the first clause to be guilty of a criminal refusal to pay over funds collected, as provided for in the second. The second clause was enacted for the purpose of reaching a class of individuals who were not and could not be punished under the first clause: a class of collecting agents who were not even civilly liable until after demand. It is true that a demand and refusal may be evidence of an embezzlement under the first clause, but it would not necessarily constitute the embezzlement; and then it will not be supposed that, in enacting this second clause, the legislature was simply putting in a statute of evidence in embezzlement cases. If, by the amendment of 1873, the legislature did not provide for two distinct felonies, and felonies that, so far as the same individual and the same funds are concerned, are as to each other inconsistent and repugnant, then we have in this amendment an indirect attempt to legislate out of existence the statute of limitations so far as embezzlements are concerned, for the addition clearly amounts to this and no more: 'That whenever any agent, officer or servant mentioned in § 88, ch. 31, shall have embezzled any such moneys mentioned in said section, and shall neglect or refuse to deliver to his employer, on demand, the same, unless the same shall have been lost by means beyond his control,' &c., 'or his employer has permitted him to use the same, he shall upon conviction,' &c. If this second clause does not make the things therein mentioned a crime, and the same did constitute a crime under the first clause, then it is an absurdity; or else the legislature simply meant to say, that if any one has at any time been guilty of embezzlement under the first clause, he is to be convicted and punished, even though prosecution for this crime is barred by the statute of limitations,

provided the demand mentioned is made and the other things stated exist; and we cannot suppose the legislature intended any such thing."

As the charge against the defendant falls solely within the last part of this section, it is unnecessary to stop here to consider the questions suggested by counsel. There is no renewing of an old crime by a late demand. The defendant, if guilty of any crime under the statutes, is guilty of the crime of improperly refusing to pay over, on demand, moneys belonging to his employer.

As the jury specially found the defendant guilty under the third count, and as the punishment imposed was no greater than that warranted by such count, we may ignore all matters save those arising under this as a single and separate charge.

Among the questions deserving notice after passing the construction of the statute, is whether the defendant was in fact an agent. It is claimed that all his authority to act ceased in 1873, and that whatever he did thereafter was done by him upon an unwarranted assumption of authority; that his acts did not bind the state, that the money he received was received by one having no authority to receive it, and that whatever may be the nature of the wrong done to the parties paying, he is guilty of no embezzlement of the state's moneys. This claim is based, not upon any alleged revocation of his authority by any board of directors or regents, but as the necessary result of legislative action. It may be an important question, not only in this case, but also in controversies which may hereafter arise between the state and parties purchasing and receiving contracts of sale from the defendant. For if the defendant was not legally the agent of the state after 1873, then the parties purchasing from him as such agent can have no legal claim on the state for the fulfillment of their contracts or credits for moneys paid to him. A brief reference to the legislation on the matter will be necessary. These are the acts:

1st. An act in 1863, establishing and locating the normal

14—22 KAS.

school, and endowing it with the salt-spring lands. (Gen. Stat., p. 582.)

2d. An act in 1864, organizing the school, and placing it under the direction of a board of directors. (Gen. Stat., p. 589.) This act contains in detail many provisions for the administration of the school, but says nothing in reference to the sale of the school lands.

3d. An act in 1866 (Gen. Stat., p. 593), and a substitute therefor in 1872 (Laws 1872, p. 378), providing for the sale of the lands. This act makes no provision for the administration of the school, except that it declares that the interest on the proceeds shall be applied to the maintenance and support of the school under the direction of the directors, but does make full and complete provision for the sale of the lands, authorizes the directors to sell, and to appoint an agent with power to make contracts and receive money.

4th. An act in 1873 (Laws 1873, p. 251), placing the government of the school in a board of regents. This was a general act in reference to all the state institutions of learning, and assigns the government of each to a separate board of regents. It does not attempt to prescribe any detail in reference to their management, but simply changes the governing body, reducing its numbers, and changing its name. It empowers it as a "board of control, with full and complete powers to adopt and enforce all necessary rules and regulations required under the law for the government of said institution." It makes no special reference to the sale of the lands. It does not by name repeal any prior act, but in terms repeals all "parts of acts" in conflict with its provisions.

5th. An act in 1877 (Laws 1877, p. 236), changing the number and term of the regents. This act in terms directs the regents to sell the lands under the provisions of the law of 1872, simply reducing the minimum price. It impliedly, therefore, recognizes the act of 1872 as still subsisting and in force. These are all which bear upon the present question.

It is evident, therefore, that the act of 1872 was never in terms repealed. If repealed at all, it has been only by implication, but such repeals are not favored, and can only be sustained when the two acts are repugnant and cannot both have force and effect, or where the latter is manifestly an entire substitute for the former. (1 Kent's Com., p. 467, and cases cited in note.) Either one of two results seems to us properly to follow: either that the board of regents took the place of the board of directors in the mere administration of the school, leaving the board of directors with the power to continue in the sale of the land, or the board of regents took the place of the board of directors in all matters relating to the school, including both its properties and its administration. The latter, from the subsequent legislation of 1877, would seem to have been the understanding of the legislature. And the management of not only the normal school, but also of the agricultural college, whose governing board was also prescribed in the same act of 1873, seems to have been conducted upon this understanding. And this is a case where the maxim that that which is within the intent of the statute is within the statute, may well have force; though it matters not which may be the correct interpretation so far as the powers, duties and responsibilities of the defendant are concerned. In either case, he was the state's agent, with power

4. Agency, not revoked.

to sell and receive pay, and under obligation to pay the receipts less his commission into the state treasury. Certainly, his plea that though he acted as agent, sold the land as agent, and collected money as agent, and then appropriated it to his own use, yet he was not in fact and in law an agent, is not one calling for any forced or strained construction of the statutes.

Another matter of moment is that of demand. Under this third count the gist of the crime is the refusal to pay *upon demand;* a mere neglect to pay when due is insufficient; and a demand must be proved before any conviction can be had. Such demand must also be in the line of authority, and not from a mere stranger. So far we agree with counsel for ap-

pellant, but we cannot concur in other matters they press in connection with the question of demand. It need not be by the party to whom the money was actually payable, the state treasurer. The defendant held his position as agent by appointment of the board, and was at all times subject to their control and direction. To their care was given the matter of the sale of the lands, and a demand by them, or a committee duly appointed therefor, was a demand in the line of authority, and not a mere intermeddling by a stranger. Neither is it necessary that the authority granted to a committee be an express direction to make a formal demand, nor that a copy of such direction be formally presented; nor that the notification actually given by the committee be in express words a demand for the payment of the money. It must be borne in mind that this is not a case where a right to retain and use the money existed until demand, in which case more formality and precision might be necessary to change a rightful into a wrongful holding; that the defendant was all the time derelict in duty in withholding payment; and in such a case anything which amounts to a notification by one lawfully authorized, that he is expected now to perform that neglected duty, is a sufficient demand. In the language of the instructions, which we quote with approbation, in order to constitute a legal demand no particular words are necessary to be used. If the party making the demand use language that plainly indicates to the party upon whom the demand is to be made what he is required to do, this would constitute a legal demand. And turning to the testimony, we find ample to sustain a finding of a demand. Indeed, while counsel have placed much stress upon this, none of the questions we notice in this opinion seem to us of so little doubt or difficulty.

5. Demand in embezzlement; form of.

The resolutions upon which the committee was appointed and acted, and both of which were passed at the same meeting of the board, are as follows:

"On motion of Mr. Crichton, it was *ordered by the board that a committee of two be appointed to report at the regular*

*meeting in June next the amount of normal school lands sold;
the condition of the funds derived from lands already sold; to
make. a survey of said lands, if practicable; and report gener-
ally upon the propriety of further sale of said lands, and upon
any other matter germane to the subject.*

"*Resolved,* That the agent of the board of regents for the
sale of lands of state normal school be required to deposit all
moneys received by him for the sale of said lands into the
state treasury as the law provides, as soon as the amount
thereof shall be ascertained by the committee to be appointed
this day."

It is not pretended that any copy of these resolutions was
ever presented to defendant, or that he ever saw them; but
in pursuance thereof, the committee had two interviews with
him in relation to the matter, at an interval of nearly a year,
in the first of which he gave them a statement of lands sold
and moneys received, which he said was complete, and paid
over the money; at the second, a much larger sum was
named, but no payment made. We make the following ex-
tracts from the testimony of one of the committee, James H.
Crichton, as to what transpired at the first interview:

"I and Dr. Wright were appointed a committee to call
upon Bancroft, and demand settlement and account of his
doings as agent. About the 18th of April, 1877, they went to
B.'s office, and asked a statement of the land sold and money
received, and all his transactions. He gave us a small slip
of letter paper, which he said contained a list of all lands
sold and money received. . . . The total amount of prin-
cipal he said he had in his hands was $2,148.90, interest
$621.33, in all $2,770.23, which amount we received from
him then and there. I asked him if that was a full account
of his transactions up to that time. He said it was. I asked
if he kept any book entry of sales, showing the time of the
sale, the land sold, and the purchase price. He said 'No.'
I demanded of him, on behalf of the board, all papers, etc.,
pertaining to these lands in his possession. He handed me
a small account book, together with a roll of legal cap upon
which had been written a description of the land and the ap-
praisement of Prescott. I asked him for a full report, and
he had this [referring to above slip of paper] prepared, and
said he had that amount and would turn it over. I asked

him again why in the name of sense he did not put the money in the treasury."

Dr. Wright, the other member of the committee, also testified:

"I cannot state the words; the substance was that Mr. Crichton made a demand of Bancroft, asking him for the money, stating that we called to get the amount of money for the land sold."

And in reference to the second interview, Crichton testified that he said to defendant:

"I understand you have sent in another report. He said, 'Yes.' I asked him if he had made a clear report this time. He said he had, of all his doings. I remarked, that 'from that report you owe the state $8,000.' He said yes—that he had that much of the school funds. I remarked, 'I suppose you are ready to pay the amount?' or language to that effect. He said no—he was not. I remarked that the money was what we most needed. He said he was unready to pay. I asked him what he had done with the money. He said he did not know—he had used it for different things."

Further than this, the defendant had an interview with the board after these interviews with the committee, with reference to his deficiency and a settlement of the same, in which he stated his resources, and that he could pay the interest on the deficiency during the year, and the principal in two years.

We see no reason to doubt the sufficiency of the testimony in this respect to sustain the verdict of the jury.

A final matter that we shall notice is the competency of one of the jurors, W. O. Ferguson. On his *voir dire* this juror testified that he had neither formed nor expressed any opinion as to the guilt or innocence of defendant, and was without bias or prejudice. At the same time, two witnesses were called who testified that they heard him say that he was afraid defendant had got himself into a bad scrape, and had "got his foot into it," or words to that effect. On reëxamination the juror declared he had no recollection of any such conversation as stated by these witnesses. A challenge was

6. Juror;
   challenge
   overruled;
   not error, in
   case stated.

then overruled, and he served as a juror. On a motion for a new trial, several witnesses testified to hearing similar remarks from the juror. Ferguson was recalled, and denied these statements; testified that he had not been on speaking terms with one or two of the witnesses, and had not been present at the times and places named by others. Some of the testimony on this motion was given by affidavit and some orally. The court overruled the motion, and this is alleged as error.

Upon this we remark, that if this question hinged solely upon oral testimony we should with little hesitation sustain the ruling of the district court as its decision upon a mere question of fact. It was, however, presented principally upon affidavits and only partially upon oral testimony, so that it comes before us in a different attitude. We may remark further, that if the case was one principally of fact, and the question was whether the defendant did the acts charged against him, especially if that question was a doubtful one, we should have expected that the district court would have sustained the motion and given the defendant the benefit of the doubt.

But where, as in the case at bar, the questions are principally questions of law, and the acts and conduct of the defendant as admitted and testified to by himself taken in conjunction with undisputed and unquestioned facts, make out a strong case of guilt, and the district court who saw the juror and heard the testimony, both oral and written, sustains his qualifications, it does not seem to us that substantial justice requires that the judgment be reversed and the case remanded for a new trial. We frankly admit our hesitation in arriving at this conclusion, and only the peculiar character of the case and the questions involved in and presented at the trial, incline us to the opinion that the substantial rights of the defendant have not been invaded by this ruling.

Many other questions have been presented, and discussed by counsel with great ability. We have endeavored to notice those matters which struck us as most important and

difficult.   We have examined the others, and see nothing which would seem to us to justify a reversal.   Indeed, reading the story of the defendant's acts and conduct as told by himself, his dereliction of duty presents a crime which no smoothness of words or politeness of language can obliterate or conceal.

The judgment will be affirmed.

VALENTINE, J., concurring.

HORTON, C. J., concurring specially as follows:

I concur in the decision in this case, but if the appellant had not gone upon the witness stand and given the evidence I find from him in the record, I would have favored a reversal of the judgment, and the granting of a new trial on account of the manner in which the jury was constituted.   I consider, however, his testimony a detailed statement or confession of guilt; that is, the evidence given by him involves guilt under the law.   Therefore, under the circumstances, the errors of the trial court were not substantial ones — at least, not sufficiently so to be prejudicial to the rights of the accused.