## INTOXICATING-LIQUOR CASES.

1. DRUGGIST'S PERMIT FROM PROBATE JUDGE, *Valid*. The legislature has the power under the constitution to cast upon the person holding the office of judge of the probate court the duty of issuing permits or licenses for the sale of liquor, as provided in chapter 128 of the laws of 1881.

2. ———— Said chapter 128, so far as it purports to regulate the sale of liquor for medical and other purposes, is not in conflict with the constitution because it restricts the right to sell to druggists.

3. CONSTRUCTION OF STATUTES; *Rule*. While in order to determine the true scope and meaning of a statute, its letter is to be first examined and considered, yet courts should also have regard to the evil sought to be remedied, for that which is within the letter though not within the spirit of the statute, is not in legal contemplation a part of it.

4. ———— The evil sought to be remedied by said chapter 128 is the use of intoxicating liquors as a beverage. This purpose interprets the law.

5. INTOXICATING LIQUOR, *Judicial Notice of*. Whatever is generally and popularly known as intoxicating liquor, such as whisky, brandy, gin, etc., is within the prohibitions and regulations of the statute, and may be so declared as matter of law by the courts.

6. MEDICINE, *Judicial Notice of*. Whatever, on the other hand, is generally and popularly known as medicine, an article for the toilet, or for culinary purposes, recognized, and the *formula* for its preparation prescribed, in the United States dispensatory, or like standard authority,

| 25 | 751 |
| 40 | 50 |
| 40 | 91 |
| 25 | 751 |
| 42 | 574 |
| 25 | 751 |
| 44 | 92 |
| 25 | 751 |
| 47 | 142 |
| 47 | 205 |
| 47 | 419 |
| 25 | 751 |
| 50 | 279 |
| 25 | 751 |
| 52 | 55 |
| 25 | 751 |
| 54 | 12 |
| 25 | 751 |
| 55 | 598 |
| 25 | 751 |
| 61 | 840 |
| 25 | 751 |
| 65 | 23 |
| 65 | 239 |
| 25 | 751 |
| 70 | 41 |
| 25 | 751 |
| 76 | 716 |
| 25 | 751 |
| 78 | 621 |
| 80 | 683 |

and not among the liquors ordinarily used as intoxicating beverages, such as tincture of gentian, paregoric, bay rum, cologne, essence of lemon, etc., is without the statute, and may be so declared as matter of law by the courts, and this notwithstanding such articles contain alcohol, and in fact, and as charged, may produce intoxication.

7. BITTERS, CORDIALS, TONICS, ETC.; *Jury; Rule.* As to articles intermediate these two classes, articles not known to the United States dispensatory, or other similar standard authority, compounds of intoxicating liquors with other ingredients, whether put up upon a single prescription and for a single case, or compounded upon a given *formula* and sold under a specific name, as bitters, cordials, tonics, etc., whether they are within or without the statute, is a question of fact for a jury, and not a question of law for a court. The rule or test is this: if the compound or preparation be such that the distinctive character and effect of intoxicating liquor are gone, that its use as an intoxicating beverage is practically impossible, by reason of the other ingredients, then it is outside the statute. But if, on the other hand, the intoxicating liquor remain as a distinctive force in the compound, and such compound is reasonably liable to be used as an intoxicating beverage, then it is within the statute.

*Appeal from Leavenworth District Court, etc.*

EIGHT CASES, heard and considered together in this court in June, 1881. These cases are as follows:

May 23, 1881, were filed in the district court of Leavenworth county four informations, one thereof (No. 2278) charging that —

"S. H. Holmes, a druggist at said county of Leavenworth and within the jurisdiction of this court, on the 19th day of May, 1881, did unlawfully, in the city of Leavenworth, in the county of Leavenworth and state of Kansas, at his place of business in his store situate on lots 1, 2 and 3 in block 27, Clark & Rees's addition to the city of Leavenworth, being on the southwest corner of Fifth and Chestnut streets, in said city of Leavenworth, county and state aforesaid, sell one pint of bay rum, and no more, for the purposes of bathing and toilet use; that such liquid called bay rum and so sold as aforesaid, is and was obtained by distilling rum with the leaves of the *Myrcia acris,* and such distilled preparation is of the same specific gravity and strength as proof spirit or whisky, and that said bay rum so sold and composed as above stated will produce intoxication; that said S. H. Holmes at the time of such sale was a druggist, and engaged in and car-

rying on the retail drug business in said city and county of Leavenworth and state of Kansas, and that at the time of the aforesaid sale of one pint of bay rum as aforesaid, said S. H. Holmes had not taken out any druggist's permit, nor did said S. H. Holmes have any druggist's permit at such time, nor had said S. H. Holmes in any manner complied or attempted to comply with any of the provisions of chapter 128 of the laws of Kansas of 1881, approved February 19, 1881, being an act entitled 'An act to prohibit the manufacture and sale of intoxicating liquors, except for medical, scientific and mechanical purposes, and to regulate the manufacture and sale thereof for such excepted purposes': contrary to the form of the statute in such case made and provided, and against the peace and dignity of the state of Kansas."

Another (No. 2279) of the aforesaid informations, in like manner and form charged that the defendant did unlawfully sell, for medical purposes, one-half pint of tincture of gentian compound; another (No. 2280) thereof, in like manner and form, charged the defendant with an unlawful sale, for medical purposes, of one and one-half pints of Dr. J. H. McLean's "Strengthening cordial and blood purifier"; another (No. 2281) thereof, in like manner and form charged the defendant with an unlawful sale, for culinary purposes, of one-half pint of the essence of lemon.

In each of the above cases the defendant filed a motion to quash the information therein, for the reason that the facts stated therein do not constitute a public offense. These motions were argued by counsel, and taken under advisement by the court until May 27th, 1881, when in each of the cases the court sustained the motion therein filed, and ordered and adjudged that the information therein be quashed and held wholly for naught. The State excepted, and brought the foregoing cases to this court.

May 30, 1881, were filed in the district court of Shawnee county four informations, one thereof (No. 2293) charging that—

"A. E. Barnes, a druggist or apothecary, on the 26th day of May, 1881, was and for four years next before that day had been doing business as such druggist or apothecary at

48 — 25 KAS.

No. 187, on Kansas avenue, in the city of Topeka, at said county, and within the jurisdiction of this court, then and there, on said 26th day of May, 1881, without having procured a druggist's permit therefor from the probate judge of said Shawnee county as required by the act relating to the manufacture and sale of intoxicating liquors, passed and approved February 19th, 1881, unlawfully sold and delivered to one Martin O'Neal one-half pint of a certain fermented liquor, to wit, brandy, upon a prescription duly made and signed by one H. K. Tefft, M. D., he, the said H. K. Tefft, then and there being a regular practicing physician residing in said city of Topeka, and then and theretofore regularly engaged in the practice of his profession as a business in said city, which said prescription is in the words and figures following, to wit:

℞ Best brandy, Oss.   For Martin O'Neal, No. 347 Kansas avenue.
     H. K. Tefft, M. D.   May 26, 1881.

He, the said Martin O'Neal, then and there being actually sick; that is to say, he, the said Martin O'Neal, then and there being afflicted with a disease known as *phthisis pulmonalis*, or consumption of the lungs, and being then and there the patient of said H. K. Tefft, a practicing physician as aforesaid, and the case being one where the said physician deemed brandy necessary for the health of his said patient, and in the judgment of such physician the use of brandy was then and there necessary as a remedy for such sickness; and the said H. K. Tefft, physician as aforesaid, before the making of such prescription for said one-half pint of brandy, having made and filed with the probate judge of said county of Shawnee the affidavit required by § 3 of said act passed and approved February 19th, 1881, to be made and filed by practicing physicians regularly engaged in the practice of their profession: contrary to the form of the statute, and against the peace and dignity of the state of Kansas."

And another thereof (No. 2294) charging that—

"Henry K. Rowley, a druggist or apothecary, on the 20th day of May, 1881, was, and for thirteen years next before that day had been, doing business as such druggist or apothecary, at No. 182, on Kansas avenue, in the city of Topeka, at said county, and within the jurisdiction of this court, then and there, on said 20th day of May, 1881, without having procured a druggist's permit therefor from the probate judge of said Shawnee county, as required by the act relating to the

manufacture and sale of intoxicating liquors, passed and approved February 19th, 1881, unlawfully sold and delivered to the Atchison, Topeka & Santa Fé railroad company, a corporation doing business and having its repair shops in said city of Topeka, four and one-half gallons of a certain intoxicating liquor called and known as 'alcohol,' said sale being made upon the written order of the storekeeper of said railroad company, which said order was and is in words as follows:

'TOPEKA, KAS., May 20, 1881.

'*Rowley Brothers, Topeka:* Please furnish the following for A. T. & S. F. railroad, to be used by said railroad company for mechanical purposes only: 4½ gals. alcohol. W. A. COOPER, *Storekeeper.*'

That said W. A. Cooper, storekeeper as aforesaid, did not, nor did any other person, nor any officer or agent of said railroad company, verify said order by affidavit or otherwise, nor did any officer or agent of said railroad company make any verified application for the purchase of the said four and one-half gallons of alcohol so sold as aforesaid by said Henry K. Rowley: contrary to the form of the statute, and against the peace and dignity of the state of Kansas."

And another thereof (No. 2295) charging that—

"Henry K. Rowley, a druggist or apothecary, on the 10th day of May, 1881, was, and for thirteen years next before that day had been, doing business as such druggist or apothecary, at No. 182, on Kansas avenue, in the city of Topeka, at said county, and within the jurisdiction of this court, then and there on said 10th day of May, 1881, without having procured a druggist's permit therefor from the probate judge of said Shawnee county, as required by the act relating to the manufacture and sale of intoxicating liquors, passed and approved February 19th, 1881, unlawfully sold and delivered to one Henry Tryon eight ounces or one-half pint of a certain distilled liquor, to wit, whisky (otherwise called *spiritus frumenti*), mixed or compounded with two ounces of syrup of tolu and two ounces of syrup of wild cherry, such sale being made upon a certain prescription duly made and signed by one George Wyman, M. D., he, the said George Wyman, then and there being a regular practicing physician residing in said city of Topeka, and then and theretofore regularly engaged in the practice of his profession as a business in said city, which said prescription is in the words and figures following, to wit:

℞ Syr. tolu, oz. ii; syr. wild cherry, oz. ii; spr. frumenti, oz. viii; mix. sig. A tablespoonful three or four times a day.— Geo. Wyman, M..D.

The said Henry Tryon then and there being actually sick; that is to say, he, the said Henry Tryon, then and there being afflicted with the disease known as *phthisis pulmonalis*, otherwise called consumption of the lungs, and being then and there the patient of said George Wyman, a practicing physician as aforesaid, and the case being one where said physician deemed whisky so as aforesaid mixed or compounded with said syrup of tolu and said syrup of wild cherry necessary for the health of his said patient, and in the judgment of said physician the use of said mixture or preparation compounded as aforesaid was then and there necessary as a remedy for such case of actual sickness; but the said George Wyman, physician as aforesaid, before the making of such prescription for said Henry Tryon, his patient as aforesaid, had not made and filed with the probate judge of said county of Shawnee the affidavit required by § 3 of said act passed and approved February 19th, 1881, to be made and filed by practicing physicians regularly engaged in the practice of their profession, nor any affidavit whatever: contrary to the form of the statute, and against the peace and dignity of the state of Kansas."

And another thereof (No. 2296) charged that—

"William E. Swift, a druggist or apothecary, at the county of Shawnee, in the state of Kansas aforesaid, and within the jurisdiction of this court, on the 26th day of May, 1881, did unlawfully, in the city of Topeka, in said county, at his place of business in his store known as No. 169 Kansas avenue, and situated on lot numbered 169, on Kansas avenue, in said city of Topeka, sell and deliver to one H. K. Rowley one bottle—that is to say, one and one-quarter pints—of Dr. B. F. Sherman's compound 'Prickly-ash bitters, No. 2,' and no more, for medical purposes; that such prickly-ash bitters, so called, to wit, that grade or quality known as No. 2, of which said grade or quality the sale aforesaid was made, is produced by mixture and maceration of the following substances and ingredients, to wit: Juniper berries, 4 lbs. 3 oz ; orange peel, 4 lbs. 3 oz.; coriander seed, 1 lb. 6 oz.; mandrake root, 4 lbs. 8 oz.; prickly-ash bark, 2 lbs. 12 oz.; prickly-ash berries, 8 oz.; senna leaves, 22 lbs.; calamus root, 14 oz.; buchu leaves, 1 lb. 12 oz.; colic root, 1 lb. 12 oz.; caraway seed, 1 lb.; and proof spirits, 65 gals.; to which, after percolating five days, there are added 8 oz. of flavor, 6 oz. extract grains of paradise, and 36 lbs. of sugar, to which there is then added a quantity of water equal to the product of all of the

before-mentioned substances and ingredients, thereby showing that in manufacturing such prickly-ash bitters, for every 65 gallons of proof spirits there are used 117 lbs. of active medicinal barks, roots, berries, etc., and 16 lbs. of stimulant aromatics, to which is added a quantity of water equal to that of the spirits, drugs and sugar used in such manufacture; that the one and one-quarter pints of Dr. B. F. Sherman's compound prickly-ash bitters, so sold by said William E. Swift as aforesaid, was produced by a mixture and maceration of the above-named ingredients; that said prickly-ash bitters is manufactured or compounded for popular sale and use as a medicine; that one gill of said prickly-ash bitters, so made and sold as aforesaid, will produce intoxication; that the said William E. Swift, at the time of the aforesaid sale of the one and one-quarter pints of Dr. B. F. Sherman's compound, was, and for more than three years next preceding such sale had been, a druggist or apothecary, and engaged in carrying on the retail drug business in the city of Topeka, aforesaid; and that at the time of the making of such sale, as aforesaid, said William E. Swift had not taken out any druggist's permit, as required by chapter 128 of the laws of Kansas, approved February 19th, 1881, relating to the manufacture and sale of intoxicating liquors, nor had said William E. Swift complied with any of the requirements of said statute: contrary to the form of the statute in such case made and provided, and against the peace and dignity of the state of Kansas."

In each of the four cases last aforesaid was filed a motion to quash the information therein, for the reason that said information does not state facts constituting a public offense. June 7, 1881, these motions were argued and submitted; on consideration whereof the court overruled the motions in the first two (Nos. 2293, 2294) of the four cases last aforesaid, the defendants, *Barnes* and *Rowley*, respectively, excepting. Thereupon there was a trial by the court, a jury being waived; finding and judgment for *The State*, each defendant being fined $100 and costs. They have appealed to this court. In each of the two cases last aforesaid the court sustained the motion therein filed, and ordered and adjudged that the information therein be quashed, from both of which decisions *The State* has appealed.

The cases were argued orally by *W. A. Johnston*, attorney general, and *A. H. Vance*, county attorney of Shawnee county, for *The State;* and by *W. C. Webb*, and *Geo. R. Peck*, for the druggists. The opinion herein was filed June 21, 1881.

The opinion of the court was delivered by

BREWER, J.: These cases present for our consideration some inquiries concerning the prohibitory law of last winter. (Laws 1881, ch. 128.) These inquiries relate to that portion of the statute which attempts to regulate the sale of intoxicating liquors for medical, scientific and mechanical purposes. Nothing is said as to that portion which prohibits the manufacture or sale of such liquors for use as a beverage. That, for the purposes of these cases, is conceded to be constitutional and valid. And in reference to that which regulates, two distinct classes of inquiry are presented: one is as to the validity of this portion of the law taken as a whole, and the other is as to its scope and extent if it be adjudged valid. For a proper understanding of these questions, a brief reference to the statute is essential. Section 1 of the statute prohibits the sale of intoxicating liquors, with a proviso that they may be sold for the excepted purposes as provided in the act. Then section 2 provides that no one shall sell for the excepted purposes "without first having procured a druggist's permit therefor from the probate judge."

Upon this arises the first matter for our consideration. It is insisted that the jurisdiction of the probate court is defined by the constitution, (Const., art. 3, § 8,) and cannot be increased by legislative action, *expressio unius, exclusio alterius;* that while in § 2 of the act the probate judge is named, the statute as a whole shows that the power was conferred upon the probate court as a court; that it is not within the constitutional prescription as to the powers of such court; and as a conclusion therefrom, that the court having no power to issue a permit, any permit issued would be worthless, and a provision or scheme resting upon such a permit must fall with it. It may be conceded that if the permit is worthless, this entire

portion of the statute also fails, and the sale for the excepted purposes is without limitation or restriction. That such permit has no legal force was the opinion of the learned judge of the first judicial district, from whose decision four of the cases before us are brought.

We cannot yield our assent to this view. We concede the force of the argument in its favor; and if the question were a new one in this court, entirely unembarrassed by prior adjudications, it would require careful consideration and might possibly be differently determined. But we feel ourselves concluded by past decisions, decisions running back to the early history of this court, some of them made before any of the present justices were members thereof. No matter of absolute right or personal liberty, but one of technical limitation only, is involved in those decisions, and hence they should not be lightly departed from. (*The State v. Bosworth*, 13 Vt. 413.) In this case the court well says: "No questions arise more frequently in this country than those which involve the construction of the constitution and the powers of the different branches of the government, and in many of these there is no doubt an honest difference of opinion. Where, then, is the security of individual or corporate rights if these questions are to be considered as always open; if no acquiescence, even though sanctioned by a judicial decree, is to be considered as settling them?" We may remark that while the jurisdiction of the probate court is defined by the constitution, there is in that instrument no prohibition on the judges holding other offices of trust and profit, as there is in reference to the district judges and justices of this court. (Art. 3, § 13.) Hence he may hold other offices whose duties are not inconsistent with those of the probate court, and the legislature may cast upon the person holding the office of probate judge other duties and cares than those of the court over which he presides, even if it may not enlarge the jurisdiction of the probate court. This thought underlies the past rulings in this court, the past legislation of the state; and to disturb them now would unsettle many proceedings and titles. In the case of *In re Johnson*, 12 Kas. 102, Mr. Jus-

tice VALENTINE, speaking for the court, notices the various legislation concerning the many offices and duties cast upon the probate judge, and a repetition here would be useless. It may be conceded that it would be more logical and less objectionable to say that the legislature may create an office with specified duties and then make the person holding the position of probate judge the incumbent of such office, than to hold that certain duties may be cast directly upon the person holding the office of probate judge. But substance is above form. That which may properly be done in one way ought to be upheld, if possible, though done in another way; and an act of the legislature should be sustained whenever by any reasonable construction the act can be brought within the scope of the legislative power. If in this case the legislature had created the office of commissioner of licenses, and provided that the probate judge should *ex officio* be such commissioner, there could be little doubt of the constitutionality of such an act. Substantially the same thing is accomplished by casting upon him the duties named in this act. And having in view the duty of upholding an act of the legislature wherever possible, the past decisions of this court, the general recognition by all departments of the government — executive, legislative and judicial — of the correctness of such exposition of constitutional limitations, and the substance rather than the form of this proceeding, we think the casting of this duty respecting permits upon the person holding the office of probate judge must be adjudged within the power of the legislature. Clearly the act gives the power to the probate judge rather than the probate court. Only incidentally is the court mentioned, and such incidental mention ought not to overrule the force of the express naming of the judge in granting the power, sustained as it is by the frequent references to him all through the act.

We pass then to the second objection, and that is, that this portion of the statute must be pronounced unconstitutional and void because it is class legislation; because it restricts the privilege of dealing in liquor to one class, the druggists, and thus debars many from engaging in a business which is prof-

itable, and by some desired. This objection is not very strenuously urged, and cannot be sustained. It will not be doubted that the police power of the state is broad enough and strong enough to uphold any reasonable restrictions and limitations on the keeping, use or sale of any substance whose keeping, use or sale involves danger to the general public. The storage of powder or explosive and highly inflammable oils may be forbidden within city limits. The legislature may require railroads to fence their tracks, dangerous machinery to be everywhere inclosed, poisons to be labeled when sold, the practice of any profession requiring skill and knowledge to be confined to those who have passed a certain examination or pursued a prescribed course of study. By virtue of the same power, it may commit the sale of liquor to any particular class of persons which by reason of its special training and habits it may deem peculiarly fit for such duty. In the case *In re Ruth*, 32 Iowa, 253, the court says: "It has been found that the health and lives of the people demand that a few licensed persons be empowered to sell these liquors for lawful purposes, and that all others be forbidden to deal in them. Of those who are authorized, the law requires satisfactory proof of good moral character. In this respect, it differs not from all license laws which bestow privileges upon fit and proper persons making application therefor. These laws have always been sustained." Here the sale of liquor being allowed for medical purposes, druggists who deal in medicines are properly named as a suitable class to whom to intrust such sale. The law does not attempt to prescribe who may and who may not become druggists. That question each individual settles for himself. It simply says that only druggists shall sell liquor. It is like a law which should forbid any but licensed engineers from running the engine of a passenger train, any but licensed attorneys from appearing for clients in a court of record, any but medical graduates from engaging in the practice of medicine. No law of this kind interferes with individual liberty in its true sense. Such laws protect the public only in matters involving risk and danger from the acts of unfit and improper persons.

They cannot be adjudged class legislation in any objectionable and unconstitutional sense of the term.

We pass now to the second branch of these cases, the inquiry as to the scope and extent of the statute. What liquors, using that term in its broadest sense, are included? The first section prohibits the manufacture or sale of any spirituous, malt, vinous, fermented, or other intoxicating liquors. Now this language is broad and comprehensive. "Other intoxicating liquors" extends the scope so as to include every liquor which comes within the general definition of intoxicating liquor. And yet, if this section stood alone, there would be little doubt as to its meaning. It would include only such liquors as are used as a beverage. No one would think of extending it to cologne, extract of lemon, or any of those many preparations which, although they contain alcohol, the intoxicating factor in all drinks, are never used as beverages. But § 10 casts the doubt upon the statute. It reads: "All liquors mentioned in section one of this act, and all other liquors or mixtures thereof, by whatever name called, that will produce intoxication, shall be considered and held to be intoxicating liquors within the meaning of this act." This section, whose language is unfortunately chosen, is the one which has provoked this litigation, and has tended to create so much prejudice against the statute; for its letter reaches to preparations which no man can believe were within the intent of the legislature, and any interference with whose sale, if within the power of the legislature, would be felt by every one to be unnecessary and unreasonable. Alcohol is the intoxicating principle, the basis of all intoxicating drinks. Whatever contains alcohol, will, if a sufficient quantity be taken, produce intoxication. Hence, whatever liquor contains alcohol is within the statute. So reads its letter. But when we come to inquire as to the liquors which contain alcohol, we find a lengthy list of fluids which are never used as beverages. Cologne, extract of lemon, bay rum, paregoric, tincture of gentian and many other medicinal preparations contain alcohol, and all will produce intoxication. They are seldom used as a beverage, and yet they may be. Intoxica-

tion produced by drinking bay rum has been known.  Yet few will drink it.  Its uses are for the toilet.  But three of the cases before us are prosecutions for the sale of bay rum, essence of lemon and tincture of gentian, respectively.  These preparations contain alcohol, and will each, it is charged, produce intoxication.  If the statute includes such articles, many of them are absolutely and wholly shut out from sale.  The excepted purposes in the statute are "medical, scientific and mechanical."  But toilet and culinary purposes are strictly included within no one of the three.  The lady who desires cologne for her toilet, purposes cannot get a physician's prescription therefor, nor file an affidavit that she wants it for scientific or mechanical purposes, and yet only in these ways does the act provide for sales.  Did the legislature intend interference with such articles?  And if not, what is the proper construction to be given to the language in said § 10?  We have had occasion to notice heretofore the cardinal canon of construction, which is that the intent when ascertained governs, and to that all mere rules of interpretation are subordinate.  (*The State v. Bancroft*, 22 Kas. 205.)  The letter does not always express the intent.  "A thing which is within the intention of the makers of a statute, is as much within the statute as if it were within the letter; and a thing which is within the letter of the statute is not within the statute unless it be within the intention of the makers; and such construction ought to be put upon it as does not suffer it to be eluded."  (*Holmes v. Carley*, 31 N. Y. 290; Bacon's Abr., statute 1, §§ 5 and 10, and authorities cited.)  The familiar illustration is that when it was enacted "that whoever drew blood in the streets should be punished with the utmost severity," it was held not to include a surgeon who opened the vein of a person having a fit in the street.  Plowden thus quaintly expresses the same thought in his Commentary, upon the case of *Eyston v. Studd*, 2 Plow. 465: "It is not the words of the law, but the internal sense of it, that makes the law, and our law (like all others) consists of two parts, viz., of body and soul; the letter of the law is the body of the law, and the sense and reason of the law are the soul of the law, *quia ratio*

*legis est anima legis.* And the law may be resembled to a nut, which has a shell and a kernel within: the letter of the law represents the shell and the sense of it the kernel; and as you will be no better for the nut if you make use only of the shell, so you will receive no benefit from the law if you rely upon the letter, and as the fruit and profit of the nut lie in the kernel, and not in the shell, so the fruit and profit of the law consist in the sense more than in the letter. And it often happens, that when you know the letter, you know not the sense, for sometimes the sense is more confined and contracted than the letter, and sometimes it is more large and extensive." Doubtless the letter is first to be considered in order to determine the intent of the legislature, for the courts may not read a law simply as they wish it should read. But other matters may also be considered, and among them the evils sought to remedied. It was resolved by the Barons of the Exchequer in *Heydon's Case,* 3 Rep. 7, as follows:

" For the sure and true interpretation of all statutes in general, be they penal or beneficial, restrictive or enlarging of the common law, four things are to be discerned and considered: *First,* What was the common law before the making of the act? *Second,* What was the mischief and defect against which the common law did not provide? *Third,* What remedy the parliament hath resolved and appointed to cure the disease of the commonwealth? And *fourth,* The true reason of the remedy."

Now what was the evil sought to be remedied by this statute, and the constitutional amendment of which it was an outgrowth? It was the use of intoxicating liquors as a beverage. As counsel for defendants aptly and forcibly express it, "the movement of which the amendment and the statute were the expression and the result, was not a crusade against cologne and the extract of lemon." And in this connection we quote from the careful opinion prepared by the learned judge of the third judicial district upon some of the cases now before us:

" The history of the movement which resulted in the adoption of the 'prohibition amendment,' and the enactment of the law now under consideration, and the object to be thereby secured, are too well known to give rise to any dispute.

Those who voted for the amendment were not voting to prevent the use of articles common to toilet purposes or culinary use. It was no attack upon bay rum, camphor, or tincture of lemon; it was intended to strike at such liquors and mixtures only as were in ordinary and known use as intoxicating beverages, or which, in the failure to obtain such beverages, it could reasonably and fairly be believed would be used as substitutes. It seems that this intent and object of the law must be taken into consideration as an important element in its construction; and that while some particular preparation or 'patent medicine' might possibly in a few cases, with a few exceptional constitutions, produce effects similar to intoxication — at an enormous risk of health or life, perhaps — the real question and test to which each 'liquor' or 'mixture' is to be submitted, is about this: 'Is there reasonable danger that this will be used as — or as an equivalent substitute for — an intoxicating beverage?' The law should receive a reasonable construction — equally removed on the one hand from a fanatical coloring, and on the other from a tendency to fritter it away."

With these general considerations, we pass to a decision of the particular questions presented. It cannot be doubted but that §10 is broad and sweeping enough to bring within the statute every liquid which, by reason of the presence of alcohol, will produce intoxication, and this irrespective of the amount of alcohol contained, or the presence of other ingredients of such a character as to prevent any use of the liquid as a beverage. But such was not the intent of the legislature in the act, and such therefore cannot be adjudged to be its true import. And speaking for himself alone, the writer of this opinion does not hesitate to say that such a construction, if imperatively demanded by the language used, would carry the statute beyond the power of the legislature. I do not think the legislature can prohibit the sale or use of any article whose sale or use involves no danger to the general public. The habits, the occupation, the food, the drink, the life of the individual, are matters of his own choice and determination, and can be abridged or changed by the majority speaking through the legislature only when the public safety, the public health, or the public protection requires it. I do not think the legislature has the power to prohibit the raising or sale of

corn, though out of it whisky may be obtained. No more do I believe that the legislature has the power to prohibit the sale of cologne, though alcohol be in it. The constitutional guaranty of "life, liberty, and the pursuit of happiness," is not limited by the temporary caprice of a present majority, and can be limited only by the absolute necessities of the public.

But the legislature never intended such a sweeping prohibition. The use of intoxicating liquors as a beverage was the evil, and the statute must be read in the light thereof. It intended to put a stop to such use, and limit the use to the necessities of medicine. Now the cases before us group themselves into three classes; and the same division is far reaching and of general application. The first embraces what are generally and popularly known as intoxicating liquors, unmixed with any other substances. Thus in one case the sale of brandy is charged. The second includes articles equally well known, standard articles, and which, while containing alcohol, are never classed as intoxicating beverages. Their uses are culinary, medical, or for the toilet. They are named in the United States dispensatory and other similar standard authorities; the *formulæ* for their preparation are there given; their uses and character are as well recognized and known by their names as those of a horse, a spade, or an arithmetic. The possibility of a different and occasional use does not change their recognized and established character. A particular spade may be fixed up for a parlor ornament, but the spade does not belong there. So, essence of lemon may contain enough alcohol to produce intoxication, more alcohol proportionately than many kinds of wine or beer. It is possible that a man may get drunk upon it, but it is no intoxicating liquor. Bay rum, cologne, paregoric, tinctures generally, all contain alcohol, but in no fair or reasonable sense are they intoxicating liquors or mixtures thereof. The third class embraces compounds, preparations, in which the alcoholic stimulant is present, which are not of established name and character, which are not found in the United States dispensatory, or other like standard authorities, and which may be purely medicinal in their purpose and effect, or mere sub-

stitutes for the usual intoxicating beverages.   If not intoxi-
cating liquors they may be "mixtures thereof" within the
scope of the statute.   Here belong many of the patent medi-
cines, the bitters, cordials, and tonics of the day.   Here also
are such compounds as that charged in one of the informa-
tions before us, a compound of whisky, tolu and wild cherry.

Now in reference to these several classes, we think these
rules may be laid down: The first class is within and the
second without the statute, and the court as matter of law
may so declare.   It is unnecessary, in charging the sale of
whisky, or brandy, etc., to allege that it will produce intoxica-
tion; nor will it bring the sale of essence of lemon within the
statute to allege that such essence will produce intoxication.
The courts will take judicial notice of the uses and character
of these articles.   You need not prove what bread is, or for
what purposes it is used.   No more need you in respect to
whisky or gin on the one hand, or cologne, or bay rum, on
the other.   They are all articles of established name and char-
acter.   In reference to the third class, the question is one of
fact, and must be referred to a jury.   If the compound or
preparation be such that the distinctive character and effect
of intoxicating liquor are gone, that its use as an intoxicating
beverage is practically impossible by reason of the other in-
gredients, it is not within the statute.   The mere presence of
alcohol does not necessarily bring the article within the pro-
hibition.   The influence of the alcohol may be counteracted
by the other elements, and the compound be strictly and fairly
only a medicine.   On the other hand, if the intoxicating
liquor remain as a distinctive force in the compound, and
such compound is reasonably liable to be used as an intoxi-
cating beverage, it is within the statute, and this though it
contain many other ingredients and ingredients of an in-
dependent and beneficial force in counteracting disease or
strengthening the system.   Intoxicating liquors, or mixtures
thereof: this, reasonably construed, means liquors which will
intoxicate and which are commonly used as beverages for
such purposes, and also any mixtures of such liquors as, re-
taining their intoxicating qualities, it may fairly be presumed

may be used as a beverage and become a substitute for the ordinary intoxicating drinks. Whether any particular compound or preparation of this class is then within or without the statute, is a question of fact, to be established by the testimony and determined by a jury. The courts may not say as a matter of law that the presence of a certain per cent. of alcohol brings the compound within the prohibition, or that any particular ingredient does or does not destroy the intoxicating influence of the alcohol, or prevent it from ever becoming an intoxicating beverage. Of course the larger the per cent. of alcohol and the more potent the other ingredients, the more probably does it fall within or without the statute; but in each case the question is one of fact, and to be settled as other questions of fact. (*The State v. Laffer*, 38 Iowa, 426; *Russell v. Sloan*, 33 Vt. 659; *Commonwealth v. Ramsdell*, Sup. Ct. Mass., 23 Albany L. J., p. 414.)

Entertaining these views of the true meaning and construction of this statute, the several cases before us must be disposed of as follows: In 2278, 2279 and 2281, in which cases the defendant was charged with selling bay rum, tincture of gentian, and essence of lemon, respectively, the judgment of the district court sustaining the motion to quash the informations will be sustained. In 2280, 2295 and 2296, in which the charge was selling McLean's cordial, a preparation of whisky, tolu and wild cherry, and prickly-ash bitters, respectively, the ruling quashing the informations will be reversed, and the cases remanded for trial. In 2293 and 2294, in which the defendants were convicted of selling brandy and alcohol, respectively, the judgments will be affirmed.

In these cases we have, at the request of counsel, not stopped to consider any mere technical or formal question, but have given our entire attention to the more important matters of the validity of this portion of the statute as a whole, and its general scope and extent. Matters of form and detail will be disposed of as they shall from time to time be presented in subsequent cases.

All the Justices concurring.