The State v. Cleary.

---

| 40 | 287 |
| 44 | 312 |
| 44 | 322 |
| 40 | 287 |
| 48 | 426 |
| 40 | 287 |
| 79 | 691 |

## The State of Kansas v. Patrick Cleary.

1. JUROR, *Disqualified—Error in Refusing New Trial.* A juror on his *voir dire* testified that he had neither formed nor expressed any opinion, and was without bias or prejudice, and was accepted as a juror, and served. On a motion for a new trial, two witnesses testified that, on the morning after the killing the juror had said in their presence and hearing, on being told of it, speaking of the defendant: "He has killed his man at last, has he?" "This is not the first crime of that kind that he has been guilty of." "He is a bad man, a desperate man, and they ought to hang him or do something with him, not to put the county to any expense." On reëxamination the juror at

first denied having made such statements, but on cross-examination he said he had no recollection of making any such statements, and finally said he had no recollection of what was said at the time the witnesses referred to, but admitted being present, as stated by them. He also said that he had heard all kinds of stories about the killing, and that on the evening of the funeral of the deceased he was present at a conversation, in which it was stated that the defendant had killed other men. Part of the evidence on the motion for a new trial was oral, and part in affidavit. The trial judge overruled the motion, and sustained the qualification of the juror. *Held*, That as the questions involved in this case are purely of fact, and as on the whole record a reasonable doubt of the defendant's guilt might be entertained, the trial judge ought to have sustained the motion for a new trial. The case of *The State v. Bancroft*, 22 Kas. 170, cited, and distinguished.

2. WITNESS — *Impeachment* — *Foundation to be Laid.* Before a witness can be impeached by proof of contradictory statements made in his evidence on a former trial, such contradictions must be called to his attention; and it is error to introduce them without having laid any foundation.

3. CHARGE OF COURT, *Should be Subdivided.* The better practice in criminal cases is to subdivide the charge of the court to the jury, devoting one instruction to each particular subject, and to consecutively number them.

### Appeal from Lincoln District Court.

PROSECUTION for murder. From a judgment against him at the February term, 1888, the defendant, *Patrick Cleary,* appeals. The opinion states the material facts.

*J. G. Mohler,* for appellant.

*Ed. F. Coad,* county attorney, for The State; *Garver &amp; Bond,* of counsel.

Opinion by SIMPSON, C: This is a criminal appeal from Lincoln county. The appellant, Patrick Cleary, was convicted of murder in the second degree, at the February term, 1888, of the district court of that county. His motions for a new trial and in arrest of judgment were overruled, and he was sentenced to imprisonment in the penitentiary for the term of twenty years; and from this sentence he appeals.

His counsel makes the following assignments of error:

" 1. The admission of illegal testimony over his objection.

" 2. The rejection of legal and competent testimony offered by him.

" 3. The refusal to charge the jury as specially requested.

" 4. The misdirection of the jury in a material matter of law.

" 5. The preadjudication on the part of the juror Oscar Gorten.

" 6. The verdict is not sustained by the evidence."

A general statement of the facts prior to, and at the time of the killing, will greatly aid in the solution of the questions raised. The deceased and the defendant resided in Franklin township, Lincoln county, and both had resided there for many years. They lived less than three-quarters of a mile apart, near Elkhorn creek. There had been bad blood and ill-feeling between them for years, and on the trial it appeared that each had repeatedly made threats against the other. For some days before the killing, both the deceased and the defendant had been feeding cattle for one Slavens, of Kansas City, the defendant having about three hundred head and the deceased about one hundred. The deceased was feeding the cattle in his charge on a field of corn-stalks some three or four miles away from where he lived, and watering them on the land of one Gillespie, through which runs a branch of the creek containing plenty of water. The defendant had secured from the agents of Gillespie at Lincoln Center, the exclusive water-right, and on the evening before the killing had sent a note to the deceased of the following import:

"TOWER SPRINGS, KANSAS, Jan. 2, 1888.

" JESSE TURNER — *Dear Sir:* You are hereby notified not to trespass on sec. nine where your cattle watered and fed yesterday and to-day, as I have bought the right of grass and water on the place, and need it for my own cattle. I will not have them there, and you will oblige me by keeping them off.

Respectfully yours,      PAT. CLEARY."

This note was taken to the house of Turner by one John Deming, a young man aged twenty-seven years, who was

working for the defendant at that time, and who had seen Cleary write the note. He testified that when he arrived at Turner's house and knocked at the door, it was locked, and the window was darkened by a coat hanging over it. The door was unlocked by Arthur White, a young man working for the deceased, and he went in. Mr. Turner was not at home, having gone over to a neighbor's, and he left the note with White to be delivered to Turner. He saw on a table in Turner's house, two revolvers; one he described as a cap-and-ball pistol, and the other as a cartridge pistol; and White was loading one with powder. He went back to the defendant's house and told him what he had seen at Turner's, and about the door being locked and the window darkened. The evidence disclosed that, at the time the note was delivered at his house, Turner had gone to the house of one John W. Jaycox, who lived in Ellsworth county, and about three and one-half miles distant from Turner's, to borrow a pistol. He told Jaycox that Cleary had been over to where the boys were herding the cattle, and had made some threats. He further said that he did not think he would have any occasion to use the pistol, but if Cleary pulled a gun on him he wanted to be prepared for him. Turner also said that Pat. Cleary had sent him word that he would shoot him by candle-light. Jaycox let him have the revolver, and he took it home with him. It was what was called a self-cocker, and was loaded. Jaycox and Cleary were not friendly. Turner was at the house of Jaycox about dark, and told Jaycox in response to an inquiry as to where his revolver was, that he had sold it, or traded it off. The morning on which the killing occurred, the defendant Cleary went to the house of a near neighbor, Mills, and borrowed a pistol of him; it was a Colt's navy, ball-and-cap revolver. He had another pistol with him. He said that they had found a den of wolves, and he and the boys were going to kill them — mentioning John Cleary, Fred. Buckner, and George Beggs. He said he had powder and caps, and some lead with which to pound out balls. He stayed at Mills's house probably twenty minutes, and then left in the direction

of his own house.   This occurred from one-half to three-quarters of an hour before Turner was killed.   Turner was killed in the road that runs north and south, immediately west of the defendant's house.   This road is bordered by a high hedge that separates it from the land of the defendant.   When the coroner, with the jury, reached the place where the homicide occurred, the body of Turner was lying eight or ten feet west of the wagon-track of the road, and about seventy-six feet north of a gate in the hedge in front of the house, and was lying one hundred and fifty-nine feet from the defendant's house ; and according to the evidence, at the exact spot where the deceased fell from his horse when he received the fatal shot.   The defendant's house was situated about one hundred and fifteen feet east of the hedge in front, and at that point there was a gate in the hedge fifteen and one-half feet wide, and south of this, one hundred and twenty-nine feet, there was a gap in the hedge through which the road runs, it making a bend at that point, passing to the west side of the hedge. About one hundred and fifteen feet southeast of the defendant's house his stable is located, and his corn crib is east of the stable and a little south of it, and nearer to the house than the stable, the exact distance from the house being eighty-one feet.   It was two hundred and forty-nine feet from the corn crib to where the body was found by the coroner.   These measurements were made by the county surveyor, and proven on the trial.   The defendant, after his return from the Mills house, where he had gone to borrow a revolver, melted lead and made bullets for a short time, and then went to his corn crib to throw corn to his cows and young stock.   The deceased lived south of the defendant's house about one-half mile; and the record gives no account of his movements that morning until he appeared in the road leading up past the defendant's house.   He was seen by Mrs. Mills, some time after Cleary had left their house with the pistol, to ride along the road going north, and where she saw him was about half-way between his house and that of the defendant.

Coming now to the immediate facts connected with the kill-

ing, the state rested its case on the statements made by the defendant, and the evidence of John Cleary, the defendant's son, aged seventeen years, who appears to have been the only eye-witness. One of the statements of the defendant was made to a constable of Franklin township, who happened along the road a short time after the killing, and to whom the defendant surrendered and delivered his pistol, and the other statement was made before the coroner's jury. The substance of these statements, as well as the evidence of young Cleary on the trial, was that the defendant was at his corn crib feeding his young stock, when the deceased, who was in the road in front of the house, but had passed the gate some distance, called to him to come out; that the defendant passed out through the gate and saw the deceased sitting on his horse facing south. That the deceased said to Cleary, "What are you going to do about that watering-place?" Cleary answered, "I don't propose to let you water there, as I have bought the ground and the privilege of that watering-place, and I need it for my own cattle." The deceased then said that he would water there whether Cleary would let him or not, that Cleary could not keep him from watering there; and then the defendant said, "We will see about that." The deceased then told Cleary that if he came down there he would kill him, and Cleary replied something to that remark, when the deceased pulled a club upon him and said, "God damn you, I will kill you now!" Cleary turned toward the hedge, then turned to the deceased and said, "God damn you, don't you hit me with that club;" that the deceased then laid the club down on the pommel of the saddle, and pulled the mitten off his right hand, and reached for his revolver and pulled that. Cleary drew his pistol about the same time. Cleary stated that the deceased had snapped his pistol at him once, and was in the act of firing, or trying to fire it the second time, when he fired the fatal shot. The ball from the pistol of the defendant struck the deceased in the forehead at a point over and a little to the right of the left eye, and it was found on the back part of the left lobe of the brain, very close to the inside of the

skull.　It was a good-sized leaden bullet, and went almost horizontally through the brain and head; and the medical evidence was that it would prove fatal almost instantly.　Cleary, the defendant, stated before the coroner's jury that, when the club was drawn on him by the deceased, the distance from where he was to the gate was so great that he was afraid that if he started to the gate the deceased might overtake him, as the deceased was on horseback and he was on foot.　The coroner testified that he had examined the hedge, and could not see any place in it where the defendant could have jumped through; that the only thing he could have done was to run down to the gate and go through there; and he also stated that the pistol that the deceased had was one that would carry accurately that distance.　It seems from the record that there was no dispute as to the pistols of either party; they were both fully identified.　The first person that arrived at the scene of the tragedy was George Greenay, the constable, who testified that he was driving a team of horses hitched to a wagon, and, as he approached, noticed Patrick Cleary and his brother John standing at or near the gate in the hedge; that the defendant first spoke to him, and told him not to drive over a revolver that was lying in the wagon-track of the road. This pistol was identified as the one Turner had borrowed from Jaycox.　It was lying northeast from the body, at a distance of about eleven feet.　The body of Turner was lying about twenty-seven feet from the hedge, and on the west side of the road, the head a little to the northeast, partly upon his left side, with the left arm under the body, and the right arm projecting out from the body; his left leg was straight, lying upon the ground flat, while the right leg was bent up slightly under the body; he had a cap on, or partly on; there was blood where his head was resting, and a little blood three or four feet from his head, on the buffalo-grass.　The roots of the grass were examined, and it was found that the blood had not penetrated to them.　Turner was about sixty years old, five feet ten inches high, and weighed probably one hundred and seventy-five pounds; was a man of perfect form and good

muscle. He had on when found, some kind of a fur cap, a mitten on his left hand, two coats, two pairs of pants, a pair of drawers, overshirt, undershirt, a vest, and a pair of felt boots with a pair of gum overshoes. An Osage-orange stick was lying under the body, with one end on one of the arms of the deceased. There is no description of it in the evidence as to its weight, length or thickness, but it was identified as the stick that Turner had in his hand at the time of the killing.

We are inclined to think that the weight of the evidence was to the effect that Turner was a well-disposed, rather peaceable man, while Cleary was hot-tempered, irritable, and an aggressive one. The killing occurred on the 3d day of January, and the trial was begun on the 10th day of February, 1888.

This is but a short statement, but it embodies enough, if not all, of the most material facts testified to on the trial. The cold pages of a voluminous record are a poor substitute for the dramatic incidents of a criminal trial. We do not see the witnesses, notice their manner, observe their conduct, and criticise their every action. We cannot scan the jury and see how each passing scene affects their minds. We cannot estimate the force of those facts established by circumstances, that have such an important part in the determination of cases of this character. The conflict in the evidence of the witnesses; the contradictory statements of the individual witness; the improbability of this or that theory; the fair inference to be drawn from the words of this witness or the action of that one — all these things are more difficult to gather from the printed story than when detailed by the skillful advocate, warmed up by the strife and glowing with the subject. They are all primarily for the jury; and from that and other considerations arises that reluctance on the part of the court to disturb the verdict of a jury in a criminal case, unless imperative duty demands the more rigid application of the rules of criminal law. We are confronted only by the counsel and their briefs; with one side magnifying every trivial incident; the other minimizing the more important occurrences; and

both indulging in antithetical inferences from one and the same state of facts, and all fighting with all their might for their client.

I. The first question we shall consider is what counsel is pleased to call the preadjudication of the juror Oscar Gorten. An impartial jury is one of the chief glories of the law. No suspicion should ever rest on the mind of a person convicted of crime that one or more of the jurors to whom the question of his guilt or innocence was submitted entertained either a personal prejudice against him, or had formed or expressed an opinion as to his guilt. Such an impression on the mind of a guilty man would preclude all hope of reformation, while to an innocent one it would be the most glaring injustice, the most foul wrong that could be committed. It therefore becomes the duty of the court to investigate a charge of this character most thoroughly, and if there be any doubt as to whether the juror was fair and free, to resolve that doubt, as we do all others, in favor of the defendant.

"It is the mind of the court which must be satisfied that the challenged juror is free from bias and prejudice, and not that of the juror himself. A juror, however honest, could not be trusted to decide as to the condition of his own mind, whether or not it is so free from prejudice as to give an impartial verdict, notwithstanding an opinion already formed." (*Morton v. The State,* 1 Kas. 468.)

It has been decided in very many reported cases that the most important consideration in questions about the impartiality of jurors, is whether an unjust verdict has resulted from the presence of obnoxious jurors upon the panel; if not, it would be idle to grant a new trial, which would probably be productive only of the same result. The rule therefore is, that if upon the whole record it manifestly appears that there is no reasonable doubt of the defendant's guilt, and that the proof of it is clear and convincing, and of such a character that a new trial must inevitably end in a verdict of guilty, it ought not to be granted. (Thompson and Merriam on Juries, p. 343, and authorities cited in foot-note 1, § 302.)

This particular juror on his *voir dire* examination stated in response to inquiries made by counsel on both sides, that he did not know the defendant; that he had not talked to any person about the killing who pretended to know the facts; that he had no bias or prejudice against the defendant; that he had not formed or expressed any opinion as to his guilt or innocence; that he did not know where defendant lived; that he had resided five years in Lincoln county, having previously resided in Saline that length of time; that he lived about six miles from where he now understands the defendant resided. On the hearing of the motion for a new trial, Z. T. Heminger stated under oath: That on the morning of the 4th day of January, 1888, he was at the house of the juror Oscar Gorten, in Elkhorn township, Lincoln county, and that in the presence of one J. May, the juror, Gorten, talking about the killing, said that "Pat. Cleary was a bad, desperate man, and that he thought that this was not the first crime that he was guilty of; that they ought not to allow any trial; they ought to hang him, and not make any expense to the county." Josiah May stated that he was forty-two years of age; had lived in Lincoln county for ten years, on a farm adjoining the one on which the juror Oscar Gorten resided; that he is intimately acquainted with the juror; that on the 4th day of January, 1888, he called at the house of Gorten at his request, to get some papers to carry to Lincoln Center for the juror; that he reached the house of Gorten about 9 o'clock in the morning of said day; that he found Gorten and one Zack. Heminger together, north of the house, hitching up a team of horses; that he told Gorten that they had a murder down on the creek yesterday; that Gorten asked who, and May told him that Pat. Cleary had killed old man Turner; that he had given himself up to the proper authorities, and said he had done it in self-defense; that Gorten then said, "He has killed his man at last, has he?" May said, "Yes, that's what they say." Then Gorten said, "That is not the first crime of the kind that he has been guilty of." Gorten then spoke of trouble that McReynolds had with Cleary, and also with another man

about an ox; that they had supposed that Cleary had killed the ox, but they could not prove it satisfactorily. Then Gorten spoke hastily, and said: "He is a bad man, a desperate man, and they ought to hang him, or do something with him; not to put the county to any expense." The usual affidavit of defendant and counsel that the knowledge of these facts respecting the juror came to them after the trial, was filed. The juror Gorten was examined orally on the hearing of the motion, and on his examination-in-chief he denied in positive terms that he had made the statements attributed to him by Heminger and May. On his cross-examination he recollected that Heminger and May were at his house at that time, and for the purposes stated by May, but he did not recollect any conversation between them about the killing of Turner by Cleary; that he could not recollect when he first heard of the killing, or from whom, or where. He admitted that he heard a conversation on the evening of the funeral of Turner, in which it was charged that Cleary had killed other persons; he admitted that he had heard "all kind of stories" about the killing. He said that it might have been May who first told him about the killing, but he could not recollect; and finally said he had no recollection of what was talked between him and May on the morning that May called at his house. On such a showing we are driven to the necessity of deciding between the positive statements of the two witnesses, May and Heminger on the one side, and the negative declaration of the juror on the other side, that he had no recollection of making the declarations attributed to him. The juror is not aided by any attack on the character, standing or motives of these witnesses. And then again, it was but a few days more than a month from the time of the killing until Gorten was examined as to his qualifications as a juror, and his recollection as to when, where, and from whom he had first heard of this tragedy in a quiet country neighborhood, ought to have been still fresh in his mind. He did not live at so great a distance from the deceased and the defendant but that he would naturally have heard of the killing within a short time

after it occurred.   Many of the witnesses who were examined in this case lived about as far away from the locality of the killing as Gorten, and this is especially true of some of those who testified to threats made by the defendant against the deceased.   On the hearing, the affidavits of May and Heminger were used, while the examination of Gorten on his *voir dire*, and on the hearing, are printed from the notes of the court stenographer, and hence the question is presented in the same manner as in the case of *The State v. Bancroft,* 22 Kas. 170.   It is said by BREWER, J., in that case:

"Where as in the case at bar the questions are principally questions of law, and the acts and conduct of defendant as admitted and testified to by himself, taken in conjunction with undisputed and unquestioned facts, make out a strong case of guilt, and the district court who saw the juror and heard the testimony, both oral and written, sustains his qualifications, it does not seem to us that substantial justice requires that the judgment be reversed and the case remanded for a new trial.   We frankly admit our hesitation in arriving at this conclusion, and only the peculiar character of the case and the questions involved in and presented at the trial incline us to the opinion that the substantial rights of the defendant have not been invaded by this ruling."

With this view Mr. Justice VALENTINE concurred.   HORTON, C. J., concurring specially, said:

"I concur in the decision in this case, but if the appellant had not gone upon the witness stand and given the evidence I find from him in the record, I would have favored a reversal of the judgment, and the granting of a new trial on account of the manner in which the jury was constituted."

In the case cited the defendant was accused of the embezzlement of moneys belonging to the State Normal School, and one of the principal questions was, whether or not he was the agent of the state, and this was largely determined by statutory construction.   In the case we are determining the question is one of fact pure and simple, and not of law.   The killing is admitted; the state says it was willful; the defendant claims he did it in self-defense.   This is a question that a

jury alone has the right to determine; but the jury must be a fair and impartial one, the evidence heard, competent and material, and all the proceedings conducted with due regard to legal rules. In this case, then, presenting questions of fact, we are not to be controlled by the expressions of opinion in the Bancroft case, but we are expressly warned against following it when the question involved is dependent on the facts. We are loth to express an opinion on the merits of this case, but we are compelled by an unavoidable necessity to say that the evidence preserved in this record does not so strongly impress us with the guilt of the defendant as to incline us to the opinion that the substantial rights of the defendant have not been invaded by this erroneous ruling; on the contrary, we think, as the case is one of fact entirely, and grave doubt may be fairly entertained, that the district court should have given the defendant the benefit of the doubt, and sustained the motion for a new trial for the reason that the jury was not fairly constituted. The cases of *Sam v. The State*, 31 Miss. 480; *Troxdale v. The State*, 9 Humph. 411; *Henrie v. The State*, 41 Tex. 573; *People v. Plumer*, 9 Cal. 298; *Busick v. The State*, 19 Ohio, 198; *Bishop v. The State*, 9 Ga. 121; *Cody v. The State*, 3 How. (Miss.) 27, all show similar declarations by a juror to those made by Gorten in this case, and a new trial was granted in all of them on account of the bias and prejudice of the juror.

II. In view of the fact that the case must go back for a new trial for the reason given in the first paragraph, it is useless to notice many of the other assignments of error, as they may not occur again. It may be said, however, generally, that if that part of the evidence of John Cleary, the son, that was reproduced from the coroner's jury was material, and was used before the jury to impeach his statements on the trial, the foundation for its introduction was not laid, and it was prejudicial error. We cannot determine with any precision here as to whether it was material or not; we can indulge in the supposition that the state had a theory about the presence, or rather absence of John Cleary, the brother, at the house

of the defendant at the time of the killing, that might make this evidence very material as affecting the credibility of young Cleary. There is another view in which it might become very material if the state had adopted a certain theory of the killing; but aside from all this, in any event, the allowance of such evidence without the attention of the witness being called to it on cross-examination is erroneous; but whether prejudicial to the extent of a reversal or not, must largely depend on its materiality.

III. So far as it appears from the record, we are to presume that the statement made by the defendant before the coroner's jury was a voluntary one, and this presumption is strengthened more by the omission of the defendant to state why he appeared before the coroner's jury, than by the evidence of the coroner. While we do not decide the question, we have grave doubts whether the state, before it can prove the statements of the defendant, is required to first prove affirmatively that they are voluntary. On the present state of the record we hold that the ruling was not erroneous.

IV. Some of the instructions of the court, notably the one with reference to the presumption of innocence, is subject to grave criticism, as it does not require his guilt to be established beyond a reasonable doubt. The one that follows the definition of the degrees of murder and of manslaughter is susceptible of a construction that the defendant must be convicted of some one of the degrees of murder or manslaughter, but this arises more from the fact that this part of the charge is disconnected from other parts, than from any omission in other parts to charge that he could be acquitted. The charge is not subdivided, and one instruction devoted to each particular subject, and these numbered, but runs along in narrative form, and occasionally takes a hop, skip and jump. The part of the charge on pages 444*j*, and 444*k*, that counsel complains of, is a merciful instruction, about which the defendant has no right to complain. The court says:

" Where his guilt is satisfactorily shown, and there is a reasonable doubt in which of two or more degrees of any offense

he is guilty, he can be convicted of that degree only, about which no such reasonable doubt exists."

This is better for the defendant than the statute, in cases where there is doubt about which of two degrees he is guilty.

We recommend that the case be reversed, and remanded with instructions to grant the defendant a new trial.

By the Court: It is so ordered.

All the Justices concurring.